## CHAPMAN ET AL. *v.* UNITED STATES

No. 90–5744.   Argued March 26, 1991—Decided May 30, 1991

454

REHNQUIST, C. J., delivered the opinion of the Court, in which WHITE, BLACKMUN, O'CONNOR, SCALIA, KENNEDY, and SOUTER, JJ., joined. STEVENS, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post*, p. 468.

*T. Christopher Kelly*, by appointment of the Court, 498 U. S. 1045, argued the cause and filed briefs for petitioners. *Donald Thomas Bergerson* filed briefs for Stanley Marshall, respondent under this Court's Rule 12.4, urging reversal.

*Paul J. Larkin, Jr.*, argued the cause for the United States. With him on the brief were *Solicitor General Starr*, *Assistant Attorney General Mueller*, and *Deputy Solicitor General Bryson.**

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

Section 841(b)(1)(B)(v) of Title 21 of the United States Code calls for a mandatory minimum sentence of five years for the offense of distributing more than one gram of a "mixture or substance containing a detectable amount of lysergic acid diethylamide (LSD)." We hold that it is the weight of the blotter paper containing LSD, and not the weight of the pure LSD, which determines eligibility for the minimum sentence.

Petitioners Richard L. Chapman, John M. Schoenecker, and Patrick Brumm were convicted of selling 10 sheets (1,000 doses) of blotter paper containing LSD, in violation of § 841(a). The District Court included the total weight of the paper and LSD in determining the weight of the drug to be used in calculating petitioners' sentences. Accordingly, although the weight of the LSD alone was approximately 50 milligrams, the 5.7 grams combined weight of LSD and blotter paper re-

---

*\*Alan Ellis* and *Kevin Zeese* filed a brief for the Drug Policy Foundation et al. as *amici curiae* urging reversal.

sulted in the imposition of the mandatory minimum sentence of five years required by § 841(b)(1)(B)(v) for distributing more than 1 gram of a mixture or substance containing a detectable amount of LSD. The entire 5.7 grams was also used to determine the base offense level under the United States Sentencing Commission, Guidelines Manual (1990) (Sentencing Guidelines).[1] Petitioners appealed, claiming that the blotter paper is only a carrier medium, and that its weight should not be included in the weight of the drug for sentencing purposes. Alternatively, they argued that if the statute and Sentencing Guidelines were construed so as to require inclusion of the blotter paper or other carrier medium when calculating the weight of the drug, this would violate the right to equal protection incorporated in the Due Process Clause of the Fifth Amendment.

The Court of Appeals for the Seventh Circuit en banc held that the weight of the blotter paper or other carrier should be included in the weight of the "mixture or substance containing a detectable amount" of LSD when computing the sentence for a defendant convicted of distributing LSD. The Court of Appeals also found that Congress had a rational basis for including the carrier along with the weight of the drug, and therefore the statute and the Sentencing Guidelines did not violate the Constitution. *United States* v. *Marshall*, 908 F. 2d 1312 (1990). We granted certiorari, 498 U. S. 1011 (1990), and now affirm.

Title 21 U. S. C. § 841(b)(1)(B) provides that

> "any person who violates subsection (a) of this section [making it unlawful to knowingly or intentionally manufacture, distribute, dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance] shall be sentenced as follows:

.        .        .        .        .

---

[1] Chapman was sentenced to 96 months; Schoenecker was sentenced to 63 months; and Brumm was sentenced to 60 months' imprisonment. Brief for Petitioners 4.

"(1)(B) In the case of a violation of subsection (a) of this section involving—

.        .        .        .        .

"(v) 1 gram or more of a mixture or substance containing a detectable amount of lysergic acid diethylamide (LSD);

.        .        .        .        .

"such person shall be sentenced to a term of imprisonment which may not be less than 5 years . . . ."

Section 841(b)(1)(A)(v) provides for a mandatory minimum of 10 years' imprisonment for a violation of subsection (a) involving "10 grams or more of a mixture or substance containing a detectable amount of [LSD]."   Section 2D1.1(c) of the United States Sentencing Commission, Guidelines Manual (1991) parallels the statutory language and requires the base offense level to be determined based upon the weight of a "mixture or substance containing a detectable amount of" LSD.

According to the Sentencing Commission, the LSD in an average dose weighs 0.05 milligrams; there are therefore 20,000 pure doses in a gram.   The pure dose is such an infinitesimal amount that it must be sold to retail customers in a "carrier."   Pure LSD is dissolved in a solvent such as alcohol, and either the solution is sprayed on paper or gelatin, or paper is dipped in the solution.   The solvent evaporates, leaving minute amounts of LSD trapped in the paper or gel. Then the paper or gel is cut into "one-dose" squares and sold by the dose.   Users either swallow the squares, lick them until the drug is released, or drop them into a beverage, thereby releasing the drug.   Although gelatin and paper are light, they weigh much more than the LSD.   The ten sheets of blotter paper carrying the 1,000 doses sold by petitioners weighed 5.7 grams; the LSD by itself weighed only about 50 milligrams, not even close to the one gram necessary to trigger the 5-year mandatory minimum of § 841(b)(1)(B)(v).

Petitioners argue that § 841(b) should not require that the weight of the carrier be included when computing the appropriate sentence for LSD distribution, for the words "mixture or substance" are ambiguous and should not be construed to reach an illogical result. Because LSD is sold by dose, rather than by weight, the weight of the LSD carrier should not be included when determining a defendant's sentence because it is irrelevant to culpability. They argue that including the weight of the carrier leads to anomalous results, viz: a major wholesaler caught with 19,999 doses of pure LSD would not be subject to the 5-year mandatory minimum sentence, while a minor pusher with 200 doses on blotter paper, or even one dose on a sugar cube, would be subject to the mandatory minimum sentence.[2] Thus, they contend, the weight of the carrier should be excluded, the weight of the pure LSD should be determined, and that weight should be used to set the appropriate sentence.

---

[2] Likewise, under the Sentencing Guidelines, those selling the same number of doses would be subject to widely varying sentences depending upon which carrier medium was used. For example, those selling 100 doses would receive the following disparate sentences:

| "Carrier | Weight of 100 doses | Base offense level | Guidelines range (months) |
|---|---|---|---|
| Sugar cube | 227 gr. | 36 | 188–235 |
| Blotter paper | 1.4 gr. | 26 | 63–78 |
| Gelatin capsule | 225 mg. | 18 | 27–33 |
| [Pure LSD] | 5 mg. | 12 | 10–16" |

Brief for Petitioners 11 (footnotes omitted).

Even among dealers using blotter paper, the sentences can vary because the weight of the blotter paper varies from dealer to dealer. Petitioners' blotter paper, containing 1,000 doses of LSD, weighed 5.7 grams, or 5.7 milligrams per dose. In *United States* v. *Rose*, 881 F. 2d 386, 387 (CA7 1989), 472 doses on blotter paper weighed 7.3 grams, or 15.4 milligrams per dose. In *United States* v. *Elrod*, 898 F. 2d 60 (CA6 1990), 1,990 doses on blotter paper weighed 11 grams, or 5.5 milligrams per dose. In *United States* v. *Healy*, 729 F. Supp. 140, 141 (DC 1990), 5,000 doses on blotter paper weighed 44.133 grams, or 8.8 milligrams per dose.

We think that petitioners' reading of the statute—a reading that makes the penalty turn on the net weight of the drug rather than the gross weight of the carrier and drug together—is not a plausible one. The statute refers to a "mixture or substance containing a detectable amount." So long as it contains a detectable amount, the entire mixture or substance is to be weighed when calculating the sentence.

This reading is confirmed by the structure of the statute. With respect to various drugs, including heroin, cocaine, and LSD, it provides for mandatory minimum sentences for crimes involving certain weights of a "mixture or substance containing a detectable amount" of the drugs. With respect to other drugs, however, namely phencyclidine (PCP) or methamphetamine, it provides for a mandatory minimum sentence based *either* on the weight of a *mixture or substance* containing a detectable amount of the drug, *or* on lower weights of *pure* PCP or methamphetamine. For example, § 841(b)(1)(A)(iv) provides for a mandatory 10-year minimum sentence for any person who distributes "100 grams or more of . . . PCP . . . or 1 kilogram or more of a mixture or substance containing a detectable amount of . . . PCP. . . ." Thus, with respect to these two drugs, Congress clearly distinguished between the pure drug and a "mixture or substance containing a detectable amount of" the pure drug. But with respect to drugs such as LSD, which petitioners distributed, Congress declared that sentences should be based exclusively on the weight of the "mixture or substance." Congress knew how to indicate that the weight of the pure drug was to be used to determine the sentence, and did not make that distinction with respect to LSD.

Petitioners maintain that Congress could not have intended to include the weight of an LSD carrier for sentencing purposes because the carrier will constitute nearly all of the weight of the entire unit, and the sentence will, therefore, be based on the weight of the carrier, rather than the drug. The same point can be made about drugs like heroin and co-

caine, however, and Congress clearly intended the dilutant, cutting agent, or carrier medium to be included in the weight of those drugs for sentencing purposes. Inactive ingredients are combined with pure heroin or cocaine, and the mixture is then sold to consumers as a heavily diluted form of the drug. In some cases, the concentration of the drug in the mixture is very low. *E. g., United States* v. *Buggs,* 904 F. 2d 1070 (CA7 1990) (1.2% heroin); *United States* v. *Dorsey,* 198 U. S. App. D. C. 313, 591 F. 2d 922 (1978) (2% heroin); *United States* v. *Smith,* 601 F. 2d 972 (CA8) (2.7% and 8.5% heroin), cert. denied, 444 U. S. 879 (1979). But, if the carrier is a "mixture or substance containing a detectable amount of the drug," then under the language of the statute the weight of the mixture or substance, and not the weight of the pure drug, is controlling.

The history of Congress' attempts to control illegal drug distribution shows why Congress chose the course that it did with respect to sentencing. The Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub. L. 91–513, 84 Stat. 1236, divided drugs by schedules according to potential for abuse. LSD was listed in schedule I(c), which listed "any material, compound, mixture, or preparation, which contains any quantity of the following hallucinogenic substances," including LSD. Pub. L. 91–513, § 202(c). That law did not link penalties to the quantity of the drug possessed; penalties instead depended upon whether the drug was classified as a narcotic or not.

The Controlled Substances Penalties Amendments Act of 1984, which was a chapter of the Comprehensive Crime Control Act of 1984, Pub. L. 98–473, 98 Stat. 2068, first made punishment dependent upon the quantity of the controlled substance involved. The maximum sentence for distribution of five grams or more of LSD was set at 20 years. 21 U. S. C. § 841(b)(1)(A)(iv) (1982 ed., Supp. II). The 1984 amendments were intended "to provide a more rational penalty structure for the major drug trafficking offenses," S. Rep.

No. 98–225, p. 255 (1983), by eliminating sentencing disparaties caused by classifying drugs as narcotic and nonnarcotic. *Id.*, at 256. Penalties were based instead upon the weight of the pure drug involved. See *United States* v. *McGeehan*, 824 F. 2d 677, 681 (CA8 1987), cert. denied, 484 U. S. 1061 (1988).

The current penalties for LSD distribution originated in the Anti-Drug Abuse Act of 1986, Pub. L. 99–570, 100 Stat. 3207. Congress adopted a "market-oriented" approach to punishing drug trafficking, under which the total quantity of what is distributed, rather than the amount of pure drug involved, is used to determine the length of the sentence. H. R. Rep. No. 98–845, pt. 1, pp. 11–12, 17 (1986). To implement that principle, Congress set mandatory minimum sentences corresponding to the weight of a "mixture or substance containing a detectable amount of" the various controlled substances, including LSD. 21 U. S. C. §§ 841(b)(1)(A)(i)–(viii) and (B)(i)–(viii). It intended the penalties for drug trafficking to be graduated according to the weight of the drugs in whatever form they were found—cut or uncut, pure or impure, ready for wholesale or ready for distribution at the retail level. Congress did not want to punish retail traffickers less severely, even though they deal in smaller quantities of the pure drug, because such traffickers keep the street markets going. H. R. Rep. No. 99–845, *supra*, at pt. 1, p. 12.

We think that the blotter paper used in this case, and blotter paper customarily used to distribute LSD, is a "mixture or substance containing a detectable amount" of LSD. In so holding, we confirm the unanimous conclusion of the Courts of Appeals that have addressed the issue.[3] Neither the stat-

---

[3] *United States* v. *Larsen*, 904 F. 2d 562 (CA10 1990); *United States* v. *Elrod*, 898 F. 2d 60 (CA6), cert. denied, 498 U. S. 835 (1990); *United States* v. *Bishop*, 894 F. 2d 981, 985–987 (CA8 1990); *United States* v. *Daly*, 883 F. 2d 313, 316–318 (CA4 1989), cert. denied, 498 U. S. 1116 (1990); *United*

ute nor the Sentencing Guidelines define the terms "mixture" and "substance," nor do they have any established common-law meaning. Those terms, therefore, must be given their ordinary meaning. See *Moskal* v. *United States,* 498 U. S. 103, 108 (1990). A "mixture" is defined to include "a portion of matter consisting of two or more components that do not bear a fixed proportion to one another and that however thoroughly commingled are regarded as retaining a separate existence." Webster's Third New International Dictionary 1449 (1986). A "mixture" may also consist of two substances blended together so that the particles of one are diffused among the particles of the other. 9 Oxford English Dictionary 921 (2d ed. 1989). LSD is applied to blotter paper in a solvent, which is absorbed into the paper and ultimately evaporates. After the solvent evaporates, the LSD is left behind in a form that can be said to "mix" with the paper. The LSD crystals are inside of the paper, so that they are commingled with it, but the LSD does not chemically combine with the paper. Thus, it retains a separate existence and can be released by dropping the paper into a liquid or by swallowing the paper itself. The LSD is diffused among the fibers of the paper. Like heroin or cocaine mixed with cutting agents, the LSD cannot be distinguished from the blotter paper, nor easily separated from it. Like cutting agents used with other drugs that are ingested, the blotter paper, gel, or sugar cube carrying LSD can be and often is ingested with the drug.

Petitioners argue that the terms "mixture" or "substance" cannot be given their dictionary meaning because then the clause could be interpreted to include carriers like a glass vial or an automobile in which the drugs are being transported, thus making the phrase nonsensical. But such nonsense is not the necessary result of giving the term "mixture" its dictionary meaning. The term does not include LSD in a bot-

---

*States* v. *Rose,* 881 F. 2d 386 (CA7 1989); *United States* v. *Taylor,* 868 F. 2d 125, 127–128 (CA5 1989).

tle, or LSD in a car, because the drug is easily distinguished from, and separated from, such a "container." The drug is clearly not mixed with a glass vial or automobile; nor has the drug chemically bonded with the vial or car. It may be true that the weights of containers and packaging materials generally are not included in determining a sentence for drug distribution, but that is because those items are also clearly not mixed or otherwise combined with the drug.

Petitioners argue that excluding the weight of the LSD carrier when determining a sentence is consistent with established principles of statutory construction. First, they argue that the rule of lenity requires an ambiguous statute of this type to be construed in favor of the defendant. Petitioners also argue that the statute should be construed to avoid a serious constitutional question and an interpretation of the statute that would require it to be struck down as violating due process.

The rule of lenity, however, is not applicable unless there is a "grievous ambiguity or uncertainty in the language and structure of the Act," *Huddleston* v. *United States*, 415 U. S. 814, 831 (1974), such that even after a court has "'seize[d] every thing from which aid can be derived,'" it is still "left with an ambiguous statute." *United States* v. *Bass*, 404 U. S. 336, 347 (1971) (quoting *United States* v. *Fisher*, 2 Cranch 358, 386 (1805)). "The rule [of lenity] comes into operation at the end of the process of construing what Congress has expressed, not at the beginning as an overriding consideration of being lenient to wrongdoers." *Callanan* v. *United States*, 364 U. S. 587, 596 (1961). See also, *e. g.*, *Moskal* v. *United States*, *supra*, at 107–108. The statutory language and structure indicate that the weight of a carrier should be included as a "mixture or substance containing a detectable amount" of LSD when determining the sentence for an LSD distributor. A straightforward reading of § 841(b) does not produce a result "so 'absurd or glaringly unjust,'" *United States* v. *Rodgers*, 466 U. S. 475, 484 (1984) (citation

omitted), as to raise a "reasonable doubt" about Congress' intent. *Moskal* v. *United States, supra,* at 108. There is no reason to resort to the rule of lenity in these circumstances.[4]

Petitioners also argue that constructions which cast doubt on a statute's constitutionality should be avoided, citing *Public Citizen* v. *Department of Justice,* 491 U. S. 440, 465–466 (1989). "'[E]very reasonable construction must be resorted to, in order to save a statute from unconstitutionality,'" *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Construction Trades Council,* 485 U. S. 568, 575 (1988), but reading "mixture" to include blotter paper impregnated with LSD crystals is not only a reasonable construction of § 841(b), but it is one that does not raise "grave doubts" about the constitutionality of the provision. *United States* v. *Jin Fuey Moy,* 241 U. S. 394, 401 (1916). The canon of construction that a court should strive to interpret a statute in a way that will avoid an unconstitutional construction is useful in close cases, but it is "'not a license for the judiciary to rewrite language enacted by the legislature.'" *United States* v. *Monsanto,* 491 U. S. 600, 611 (1989). Petitioners' argument is unavailing here for the reasons we explain below.

Petitioners argue that the due process of law guaranteed them by the Fifth Amendment is violated by determining the lengths of their sentences in accordance with the weight of the LSD "carrier," a factor which they insist is arbitrary. They argue preliminarily that the right to be free from deprivations of liberty as a result of arbitrary sentences is fundamental, and therefore the statutory provision at issue may be

---

[4] Petitioners point to the views of some Members of Congress that the use of the phrase "mixture or substance containing a detectable amount of LSD" was less than precise. These views were manifested by the introduction of bills in the Senate that would have excluded LSD carrier mediums from the "mixture or substance" clause. Neither of the bills was enacted into law, and it is questionable whether they even amount to subsequent legislative history—itself an unreliable guide to legislative intent. See *Pierce* v. *Underwood,* 487 U. S. 552, 566–567 (1988); *Quern* v. *Mandley,* 436 U. S. 725, 736, n. 10 (1978).

upheld only if the Government has a compelling interest in the classification in question. But we have never subjected the criminal process to this sort of truncated analysis, and we decline to do so now. Every person has a fundamental right to liberty in the sense that the Government may not punish him unless and until it proves his guilt beyond a reasonable doubt at a criminal trial conducted in accordance with the relevant constitutional guarantees. *Bell* v. *Wolfish*, 441 U. S. 520, 535, 536, and n. 16 (1979). But a person who *has* been so convicted is eligible for, and the court may impose, whatever punishment is authorized by statute for his offense, so long as that penalty is not cruel and unusual, *McMillan* v. *Pennsylvania*, 477 U. S. 79, 92, n. 8 (1986); *Meachum* v. *Fano*, 427 U. S. 215, 224 (1976), and so long as the penalty is not based on an arbitrary distinction that would violate the Due Process Clause of the Fifth Amendment. In this context, as we noted in *Jones* v. *United States*, 463 U. S. 354, 362, n. 10 (1983), an argument based on equal protection essentially duplicates an argument based on due process.

We find that Congress had a rational basis for its choice of penalties for LSD distribution. The penalty scheme set out in the Anti-Drug Abuse Act of 1986 is intended to punish severely large-volume drug traffickers at any level. H. R. Rep. No. 99–845, pt. 1, at 12, 17. It assigns more severe penalties to the distribution of larger quantities of drugs. By measuring the quantity of the drugs according to the "street weight" of the drugs in the diluted form in which they are sold, rather than according to the net weight of the active component, the statute and the Sentencing Guidelines increase the penalty for persons who possess large quantities of drugs, regardless of their purity. That is a rational sentencing scheme.[5]

---

[5] Every Court of Appeals to have addressed the issue has held that this sentencing scheme is rational. See *United States* v. *Mendes*, 912 F. 2d 434, 438–439 (CA10 1990); see *United States* v. *Murphy*, 899 F. 2d 714, 717 (CA8 1990); *United States* v. *Bishop*, 894 F. 2d, at 986–987; *United States*

This is as true with respect to LSD as it is with respect to other drugs. Although LSD is not sold by weight, but by dose, and a carrier medium is not, strictly speaking, used to "dilute" the drug, that medium is used to facilitate the distribution of the drug. Blotter paper makes LSD easier to transport, store, conceal, and sell. It is a tool of the trade for those who traffic in the drug, and therefore it was rational for Congress to set penalties based on this chosen tool. Congress was also justified in seeking to avoid arguments about the accurate weight of pure drugs which might have been extracted from blotter paper had it chosen to calibrate sentences according to that weight.

Petitioners do not claim that the sentencing scheme at issue here has actually produced an arbitrary array of sentences, nor did their motions in District Court contain any proof of actual disparities in sentencing. Rather, they challenge the Act on its face on the ground that it will inevitably lead to arbitrary punishments. While hypothetical cases can be imagined involving very heavy carriers and very little LSD, those cases are of no import in considering a claim by persons such as petitioners, who used a standard LSD carrier. Blotter paper seems to be the carrier of choice, and the vast majority of cases will therefore do exactly what the sentencing scheme was designed to do—punish more heavily those who deal in larger amounts of drugs.

Petitioners argue that those selling different numbers of doses, and, therefore, with different degrees of culpability, will be subject to the same minimum sentence because of choosing different carriers.[6] The same objection could

---

v. *Holmes*, 838 F. 2d 1175, 1177–1178 (CA11), cert. denied, 486 U. S. 1058 (1988); *United States* v. *Klein*, 860 F. 2d 1489, 1501 (CA9 1988); *United States* v. *Hoyt*, 879 F. 2d 505, 512 (CA9 1989); *United States* v. *Savinovich*, 845 F. 2d 834, 839 (CA9), cert. denied, 488 U. S. 943 (1988); *United States* v. *Ramos*, 861 F. 2d 228, 231–232 (CA9 1988).

[6] We note that distributors of LSD make their own choice of carrier and could act to minimize their potential sentences. As it is, almost all dis-

be made to a statute that imposed a fixed sentence for distributing any quantity of LSD, in any form, with any carrier. Such a sentencing scheme—not considering individual degrees of culpability—would clearly be constitutional. Congress has the power to define criminal punishments without giving the courts any sentencing discretion. *Ex parte United States*, 242 U. S. 27 (1916). Determinate sentences were found in this country's penal codes from its inception, see *United States* v. *Grayson*, 438 U. S. 41, 45–46 (1978), and some have remained until the present. See, *e. g.*, 18 U. S. C. § 1111 (mandatory life imprisonment under federal first-degree-murder statute); 21 U. S. C. § 848(b) (mandatory life imprisonment for violation of drug "super-kingpin" statute); 18 U. S. C. § 2114 (1982 ed.) (flat 25-year sentence for armed robbery of a postal carrier) (upheld against due process challenge in *United States* v. *Smith*, 602 F. 2d 834 (CA8), cert. denied, 444 U. S. 902 (1979), and *Smith* v. *United States*, 284 F. 2d 789, 791 (CA5 1960)). A sentencing scheme providing for "individualized sentences rests not on constitutional commands, but on public policy enacted into statutes." *Lockett* v. *Ohio*, 438 U. S. 586, 604–605 (1978) (plurality opinion). See also *Mistretta* v. *United States*, 488 U. S. 361, 364 (1989). That distributors of varying degrees of culpability might be subject to the same sentence does not mean that the penalty system for LSD distribution is unconstitutional.

We likewise hold that the statute is not unconstitutionally vague. First Amendment freedoms are not infringed by § 841, so the vagueness claim must be evaluated as the statute is applied to the facts of this case. *United States* v. *Powell*, 423 U. S. 87, 92 (1975). The fact that there may be plausible arguments against describing blotter paper impregnated with LSD as a "mixture or substance" containing LSD does not mean that the statute is vague. This is particularly so since whatever debate there is would center around the

tributors choose blotter paper, rather than the heavier and bulkier sugar cubes.

appropriate sentence and not the criminality of the conduct. We upheld the defendant's conviction in *United States* v. *Rodgers,* 466 U. S. 475 (1984), even though the Court of Appeals for the Circuit in which the defendant had resided had construed the statute as not applying to one in his position. Here, on the contrary, all of the Courts of Appeals that have decided the issue, and all except one District Court, *United States* v. *Healy,* 729 F. Supp. 140 (DC 1990), have held that the weight of the carrier medium must be included in determining the appropriate sentence.

We hold that the statute requires the weight of the carrier medium to be included when determining the appropriate sentence for trafficking in LSD, and that this construction is neither a violation of due process nor unconstitutionally vague. Accordingly, the judgment of the Court of Appeals is

*Affirmed.*

JUSTICE STEVENS, with whom JUSTICE MARSHALL joins, dissenting.

The consequences of the majority's construction of 21 U. S. C. § 841 are so bizarre that I cannot believe they were intended by Congress. Neither the ambiguous language of the statute nor its sparse legislative history supports the interpretation reached by the majority today. Indeed, the majority's construction of the statute will necessarily produce sentences that are so anomalous that they will undermine the very uniformity that Congress sought to achieve when it authorized the Sentencing Guidelines.

This was the conclusion reached by five Circuit Judges in their two opinions dissenting from the holding of the majority of the Court of Appeals for the Seventh Circuit sitting en banc in this case.[1] In one of the dissenting opinions, Judge

---

[1] Chief Judge Bauer and Judges Wood, Cudahy, and Posner joined Judge Cummings' dissent, see *United States* v. *Marshall,* 908 F. 2d 1312, 1326 (CA7 1990), and all of these judges also joined Judge Posner's dissent. See *id.,* at 1331.

Cummings pointed out that there is no evidence that Congress intended the weight of the carrier to be considered in the sentence determination in LSD cases, and that there is good reason to believe Congress was unaware of the inequitable consequences of the Court's interpretation of the statute. *United States* v. *Marshall*, 908 F. 2d 1312, 1327–1328 (CA7 1990). As Judge Posner noted in the other dissenting opinion, the severity of the sentences in LSD cases would be comparable to those in other drug cases only if the weight of the LSD carrier were disregarded. *Id.*, at 1335.

If we begin with the language of the statute,[2] as did those judges who dissented from the Seventh Circuit's en banc decision, it becomes immediately apparent that the phrase "mixture or substance" is far from clear. As the majority notes, neither the statute[3] nor the Sentencing Guidelines[4] define the terms "mixture" or "substance." *Ante*, at 461–462. The majority initially resists identifying the LSD and carrier as either a mixture or a substance; instead, it simply refers to the combination, using the language of the statute, as a "mixture or substance containing a detectable amount" of the drug. See *ante*, at 459, 460, 461. Eventually, however, the majority does identify the combination as a mixture: "After the solvent evaporates, the LSD is left behind in a form that can be said to 'mix' with the paper. The LSD crystals are inside of the paper, so that they are commingled with it, but the LSD does not chemically combine

---

[2] See *United States* v. *Turkette*, 452 U. S. 576, 580 (1981) ("In determining the scope of a statute, we look first to its language").

[3] The statutory definitional section applicable to § 841, 21 U. S. C. § 802, does not define "mixture or substance."

[4] The Guidelines merely provide that "[u]nless otherwise specified, the weight of a controlled substance set forth in the [offense level] table refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance." United States Sentencing Commission, Guidelines Manual § 2D1.1(c) (1991) (USSG).

with the paper." *Ante*, at 462.[5] Although it is true that ink which is absorbed by a blotter "can be said to 'mix' with the paper," *ibid.*, I would not describe a used blotter as a "mixture" of ink and paper. So here, I do not believe the word "mixture" comfortably describes the relatively large blotter which carries the grains of LSD that adhere to its surface.[6]

Because I do not believe that the term "mixture" encompasses the LSD and carrier at issue here, and because I, like the majority, do not think that the term "substance" describes the combination any more accurately, I turn to the

[5] The majority of the Seventh Circuit also identified the combination as a "mixture," see 908 F. 2d, at 1317–1318; however, other Circuits that have addressed the question have either identified the combination as a substance, see, *e. g.*, *United States* v. *Bishop*, 894 F. 2d 981, 986 (CA8 1990); *United States* v. *Daly*, 883 F. 2d 313, 317 (CA4 1989); *United States* v. *Taylor*, 868 F. 2d 125, 127 (CA5 1989), or have simply held that the combination fell within the statutory language of a "mixture or substance," without distinguishing between the two. See, *e. g.*, *United States* v. *Elrod*, 898 F. 2d 60, 61 (CA6 1990); *United States* v. *Larsen*, 904 F. 2d 562, 563 (CA10 1990).

[6] The point that the "mixture or substance" language remains ambiguous is highlighted by the Sentencing Commission's own desire to clarify the meaning of the terms. A Sentencing Commission Notice, issued on March 3, 1989, invited public comment on whether the Commission should exclude the weight of the carrier for sentencing purposes in LSD cases. A section in the Guidelines Manual, entitled "Questions Most Frequently Asked About the Sentencing Guidelines," contains a question about the "mixture or substance" language, which reflects the Commission's continuing uncertainty as to whether the blotter paper should be weighed:

"With respect to blotter paper, sugar cubes, or other mediums on which LSD or other controlled substances may be absorbed, the Commission has not definitively stated whether the carrier medium is considered part of a drug 'mixture or substance' for guideline application purposes. In order to ensure consistency between the guidelines and the statute, Application Note 1 to § 2D1.1 states that the term 'mixture or substance' has the same meaning for guideline purposes as in 21 U. S. C. § 841. Thus, the court must determine whether, under this statute, LSD carrier medium would be considered part of an LSD mixture or substance. To date, all circuit courts that have addressed the issue appear to be answering the question affirmatively." USSG, *supra*, at 599.

legislative history to see if it provides any guidance as to congressional intent or purpose. As the Seventh Circuit observed, the legislative history is sparse, and the only reference to LSD in the debates preceding the passage of the 1986 amendments to § 841 was a reference that addresses neither quantities nor weights of drugs. 908 F. 2d, at 1327; see also 132 Cong. Rec. 26761 (1986) (statement of Sen. Harkin).

Perhaps more telling in this case is the subsequent legislative history.[7] In a letter to Senator Joseph R. Biden, Jr., dated April 26, 1989, the Chairman of the Sentencing Commission, William W. Wilkens, Jr., commented on the ambiguity of the statute:

> "'With respect to LSD, it is unclear whether Congress intended the carrier to be considered as a packaging material, or, since it is commonly consumed along with the illicit drug, as a dilutant ingredient in the drug mixture. . . . The Commission suggests that Congress may wish to further consider the LSD carrier issue in order to clarify legislative intent as to whether the weight of the carrier should or should not be considered in determining the quantity of LSD mixture for punishment purposes.'" 908 F. 2d, at 1327–1328.

Presumably in response, Senator Biden offered a technical amendment, the purpose of which was to correct an inequity that had become apparent from several recent court decisions.[8] According to Senator Biden: "The amendment remedies this inequity by removing the weight of the carrier from the calculation of the weight of the mixture or sub-

---

[7] Of course subsequent legislative history is generally not relevant and always must be used with care in interpreting enacted legislation. Compare *Sullivan* v. *Finkelstein*, 496 U. S. 617, 628–629, n. 8 (1990), with *id.*, at 631–632 (SCALIA, J., concurring in part). It can, however, provide evidence that an effect of a statute was simply overlooked.

[8] See, *e. g.*, *United States* v. *Bishop*, 704 F. Supp. 910 (ND Iowa 1989).

stance." 135 Cong. Rec. 23518 (1989).[9] Although Senator Biden's amendment was adopted as part of Amendment No. 976 to S. 1711, the bill never passed the House of Representatives. Senator Kennedy also tried to clarify the language of 21 U. S. C. § 841. He proposed the following amendment:

"CLARIFICATION OF 'MIXTURE OR SUBSTANCE.'

"Section 841(b)(1) of title 21, United States Code, is amended by inserting the following new subsection at the end thereof:

"'(E) In determining the weight of a "mixture or substance" under this section, the court shall not include the weight of the carrier upon which the controlled substance is placed, or by which it is transported.'" 136 Cong. Rec. 12454 (1990).

Although such subsequent legislation must be approached with circumspection because it can neither clarify what the enacting Congress had contemplated nor speak to whether the clarifications will ever be passed, the amendments, at the

---

[9] Senator Biden offered the following example to highlight the inequities that resulted if the carrier weight were included in determining the weight of the "mixture or substance" of LSD:

"The inequity in these decisions is apparent in the following example. A single dose of LSD weighs approximately .05 mg. The sugar cube on which the dose may be dropped for purposes of ingestion and transportation, however, weighs approximately 2 grams. Under 21 U. S. C. § 841(b) a person distributing more than one gram of a 'mixture or substance' containing LSD is punishable by a minimum sentence of 5 years and a maximum sentence of 40 years. A person distributing less than a gram of LSD, however, is subject only to a maximum sentence of 20 years. Thus a person distributing a [sic] 1,000 doses of LSD in liquid form is subject to no minimum penalty, while a person handing another person a single dose on a sugar cube is subject to the mandatory five year penalty." 135 Cong. Rec. 23518 (1989).

very least, indicate that the language of the statute is far from clear or plain.

In light of the ambiguity of the phrase "mixture or substance" and the lack of legislative history to guide us, it is necessary to examine the congressional purpose behind the statute and to determine whether the majority's reading of the statute leads to results that Congress clearly could not have intended. The figures in the Court's opinion, see *ante*, at 458, n. 2, are sufficient to show that the majority's construction will lead to anomalous sentences that are contrary to one of the central purposes of the Sentencing Guidelines, which was to eliminate disparity in sentencing. "Congress sought reasonable uniformity in sentencing by narrowing the wide disparity in sentences imposed for similar criminal offenses committed by similar offenders." United States Sentencing Commission, Guidelines Manual § 1.2 (1991).[10] As the majority's chart makes clear, widely divergent sentences may be imposed for the sale of identical amounts of a controlled substance simply because of the nature of the carrier.[11] If 100 doses of LSD were sold on sugar cubes, the sentence would range from 188–235 months, whereas if the same dosage were sold in its pure liquid form, the sentence would range only from 10–16 months. See *ante*, at 458, n. 2.

---

[10] "Sentencing disparities that are not justified by differences among offenses or offenders are unfair both to offenders and to the public. A sentence that is unjustifiably high compared to sentences for similarly situated offenders is clearly unfair to the offender; a sentence that is unjustifiably low is just as plainly unfair to the public." S. Rep. No. 98–225, pp. 45–46 (1983).

"The bill creates a sentencing guidelines system that is intended to treat all classes of offenses committed by all categories of offenders consistently." *Id.*, at 51.

"A primary goal of sentencing reform is the elimination of unwarranted sentencing disparity." *Id.*, at 52 (footnote omitted).

See S. Rep. No. 97–307, pp. 963, 968 (1981) (same).

[11] See, *e. g.*, *United States* v. *Healy*, 729 F. Supp. 140, 143 (DC 1990); *United States* v. *Daly*, 883 F. 2d, at 316–318.

The absurdity and inequity of this result is emphasized in Judge Posner's dissent:

"A person who sells LSD on blotter paper is not a worse criminal than one who sells the same number of doses on gelatin cubes, but he is subject to a heavier punishment. A person who sells five doses of LSD on sugar cubes is not a worse person than a manufacturer of LSD who is caught with 19,999 doses in pure form, but the former is subject to a ten-year mandatory minimum no-parole sentence while the latter is not even subject to the five-year minimum. If defendant Chapman, who received five years for selling a thousand doses of LSD on blotter paper, had sold the same number of doses in pure form, his Guidelines sentence would have been fourteen months. And defendant Marshall's sentence for selling almost 12,000 doses would have been four years rather than twenty. The defendant in *United States* v. *Rose*, 881 F. 2d 386, 387 (7th Cir. 1989), must have bought an unusually heavy blotter paper, for he sold only 472 doses, yet his blotter paper weighed 7.3 grams—more than Chapman's, although Chapman sold more than twice as many doses. Depending on the weight of the carrier medium (zero when the stuff is sold in pure form), and excluding the orange juice case, the Guidelines range for selling 198 doses (the amount in *Dean*) or 472 doses (the amount in *Rose*) stretches from ten months to 365 months; for selling a thousand doses (*Chapman*), from fifteen to 365 months; and for selling 11,751 doses (*Marshall*), from 33 months to life. In none of these computations, by the way, does the weight of the LSD itself make a difference—so slight is its weight relative to that of the carrier—except of course when it is sold in pure form. Congress might as well have said: if there is a carrier, weigh the carrier and forget the LSD.

"This is a quilt the pattern whereof no one has been able to discern. The legislative history is silent, and since even the Justice Department cannot explain the why of the punishment scheme that it is defending, the most plausible inference is that Congress simply did not realize how LSD is sold." 908 F. 2d, at 1333.[12]

Sentencing disparities that have been described as "crazy," *ibid.*, and "loony," *id.*, at 1332, could well be avoided if the majority did not insist upon stretching the definition of "mixture" to include the carrier along with the LSD. It does not make sense to include a carrier in calculating the weight of the LSD because LSD, unlike drugs such as cocaine or marijuana, is sold by dosage rather than by weight. Thus, whether one dose of LSD is added to a glass of orange juice or to a pitcher of orange juice, it is still only one dose that has been added. But if the weight of the orange juice is to be added to the calculation, then the person who sells the single dose of LSD in a pitcher rather than in a glass will receive a substantially higher sentence. If the weight of the carrier is included in the calculation not only does it lead to huge disparities in sentences among LSD offenders, but also it leads

---

[12] His comparison between the treatment of LSD and other more harmful drugs is also illuminating:

"That irrationality is magnified when we compare the sentences for people who sell other drugs prohibited by 21 U. S. C. § 841. Marshall, remember, sold fewer than 12,000 doses and was sentenced to twenty years. Twelve thousand doses sounds like a lot, but to receive a comparable sentence for selling heroin Marshall would have had to sell ten kilograms, which would yield between one and two million doses. Platt, Heroin Addiction: Theory, Research, and Treatment 50 (2d ed. 1986); cf. Diamorphine 63, 98 (Scott ed. 1988). To receive a comparable sentence for selling cocaine he would have had to sell fifty kilograms, which would yield anywhere from 325,000 to five million doses. Washton, Cocaine Addiction: Treatment, Recovery and Relapse Prevention 18 (1989); Cocaine Use in America: Epidemiologic and Clinical Perspectives 214 (Kozel & Adams, eds., National Institute on Drug Abuse Pamphlet No. 61, 1985)). While the corresponding weight is lower for crack—half a kilogram—this still translates into 50,000 doses." 908 F. 2d, at 1334.

to disparities when LSD sentences are compared to sentences for other drugs. See n. 12, *supra;* 908 F. 2d, at 1335.

There is nothing in our jurisprudence that compels us to interpret an ambiguous statute to reach such an absurd result. In fact, we have specifically declined to do so in the past, even when the statute was not ambiguous, on the ground that Congress could not have intended such an outcome.[13]   In construing a statute, Learned Hand wisely counseled us to look first to the words of the statute, but "not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning."   *Cabell* v. *Markham,* 148 F. 2d 737, 739 (CA2), aff'd, 326 U. S. 404 (1945).   In the past, we have recognized that "frequently words of general meaning are used in a statute, words broad enough to include an act in question, and yet a consideration of . . . the absurd results which follow from giving such broad meaning to the words, makes it unreasonable to believe that the legislator intended to include the particular act."   *Church of Holy Trinity* v. *United States,* 143 U. S. 457, 459 (1892).   These words guided our

---

[13] See, *e. g., Gozlon-Peretz* v. *United States,* 498 U. S. 395 (1990) (Congress must have intended supervised release to apply to those who committed drug offenses during the interim period after the Anti-Drug Abuse Act of 1986 was enacted but before the Sentencing Reform Act of 1984 became effective even though the latter, which defined the term, had not yet become effective); *Sheridan* v. *United States,* 487 U. S. 392, 403 (1988) ("If the Government has a duty to prevent a foreseeably dangerous individual from wandering about unattended, it would be odd to assume that Congress intended a breach of that duty to give rise to liability when the dangerous human instrument was merely negligent but not when he or she was malicious"); see also *Green* v. *Bock Laundry Machine Co.,* 490 U. S. 504, 509 (1989) ("The Rule's plain language commands weighing of prejudice to a defendant in a civil trial as well as in a criminal trial.   But that literal reading would compel an odd result in a case like this"); *id.,* at 527 (SCALIA, J., concurring in judgment) ("We are confronted here with a statute which, if interpreted literally, produces an absurd, and perhaps unconstitutional, result").

construction of the statute at issue in *Public Citizen* v. *Department of Justice*, 491 U. S. 440, 454 (1989), when we also noted that "[l]ooking beyond the naked text for guidance is perfectly proper when the result it apparently decrees is difficult to fathom or where it seems inconsistent with Congress' intention . . . ." *Id.*, at 455.

Undoubtedly, Congress intended to punish drug traffickers severely, and in particular, Congress intended to punish those who sell large quantities of drugs more severely than those who sell small quantities.[14] But it did not express any intention to treat those who sell LSD differently from those who sell other dangerous drugs.[15] The majority's construction of the statute fails to embody these legitimate goals of Congress. Instead of punishing more severely those who sell large quantities of LSD, the Court would punish more severely those who sell small quantities of LSD in weighty carriers, and instead of sentencing in comparable ways those who sell different types of drugs, the Court would sentence those who sell LSD to longer terms than those who sell proportionately equivalent quantities of other equally dangerous drugs.[16] The Court today shows little respect for Congress' handiwork when it construes a statute to undermine the very goals that Congress sought to achieve.

I respectfully dissent.

---

[14] "The [House] Committee strongly believes that the Federal government's most intense focus ought to be on major traffickers, the manufacturers or the heads of organizations, who are responsible for creating and delivering very large quantities of drugs." H. R. Rep. No. 99–845, pp. 11–12 (1986).

[15] "The result [of the Code] is a consistent pattern of maximum sentences for equally serious offenses instead of the current almost random maximum sentences caused by the piecemeal approach to creation of Federal criminal laws in the past." S. Rep. No. 97–307, p. 968 (1981) (footnote omitted).

[16] "[T]he use of sentencing guidelines and policy statements will assure that each sentence is fair as compared to all other sentences." *Ibid.*