**Michael J. COLEMAN, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 20A05–9109–CR–304.**

Court of Appeals of Indiana,
Fifth District.

March 31, 1992.

---

R. Brent Zook, Goshen, for appellant-defendant.

Linley E. Pearson, Atty. Gen., Arthur Thaddeus Perry, Deputy Atty. Gen., Indianapolis, for appellee-plaintiff.

BARTEAU, Judge.

A jury found Michael Coleman guilty of delivering more than three grams of cocaine, a Class A felony under Ind.Code 35–48–4–1 ("§ 4–1"). This direct appeal argues (1) § 4–1 on its face is unconstitutionally vague, and violates the substantive

due process and equal protection guarantees of the federal constitution as well as the Indiana constitutional guarantee of proportionality in sentencing; and, (2) it was reversible error to allow prosecution witnesses to testify about what Coleman's girlfriend said when he was arrested. We affirm.

## I. CONSTITUTIONAL ISSUES

Turning first to the constitutional challenges to § 4–1, we set out that portion of the statute relevant to Coleman's case:

(a) A person who: (1) knowingly or intentionally ... delivers ... cocaine or a narcotic drug, pure or adulterated, ... commits dealing in cocaine or a narcotic drug, a Class B felony, except as provided in subsection (b).

(b) The offense is a Class A felony if: (1) the amount of the drug involved weighs three (3) grams or more;

. . . .

Coleman acknowledges that the adjectives "pure or adulterated" in subsection (a) modify "cocaine" as well as "narcotic drug," so delivery of a mixture containing even a trifle of cocaine is a Class B felony. But, he points out, the Class A felony defined in subsection (b)(1) speaks to three grams or more "of the *drug* involved," with no mention of adulteration. From that change of language, Coleman derives four constitutional arguments. We review those arguments mindful that " 'every statute stands before us clothed with the presumption of constitutionality, and such presumption continues until clearly overcome by a showing to the contrary.' " *Hall v. State* (1980), 273 Ind. 425, 435, 403 N.E.2d 1382, 1389 (quoting *Sidle v. Majors* (1976), 264 Ind. 206, 341 N.E.2d 763).

## A. VAGUENESS

■ Coleman decries Class A enhancement as unconstitutionally vague for not providing clear notice that one may be convicted of a Class A felony for delivering a mere trace of cocaine mixed with enough adulterant to make three grams. "As generally stated, the void-for-vagueness doctrine requires that a penal statute define

the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson* (1983), 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903.

Coleman's vagueness argument touches only cases involving less than three pure grams, because his criticism of § 4–1 would be inappropriate in cases that indeed concerned three grams or more of pure drug. The State's evidence showed that Coleman delivered a white powder weighing 3.23 grams and containing cocaine. The mixture was not assayed. However, Coleman described it as 75% to 80% pure to the confidential informant to whom he delivered it. Accepting that as true for the sake of argument, Coleman delivered between 2.42 and 2.58 grams of pure cocaine.

Our case law holds that Class A enhancement turns on gross rather than net weight. *See Clark v. State* (1989), Ind., 539 N.E.2d 9, 12 (discussing the issue in terms of sufficiency of the evidence); *Tobias v. State* (1985), Ind., 479 N.E.2d 508, 511 *reh'g denied* (same); *Hall, supra,* 273 Ind. at 436–38, 403 N.E.2d at 1389–90 (same; for predecessor statute with enhancement for amounts over ten grams). *See also Burst v. State* (1986), Ind.App., 499 N.E.2d 1140, 1150, *trans. denied* (enhanced sentence for delivery of larger amounts of marijuana turns on gross weight). Although we know of no Indiana case discussing this issue in express terms of vagueness, we believe the question is answered in *Lawhorn v. State* (1983), Ind., 452 N.E.2d 915, which in addressing what seems a vagueness argument reported only that the appellant considered the enhancement "unconstitutional," without specifying the constitutional basis for the argument. *Id.* at 917. In *Lawhorn* the supreme court explained:

The antecedent of 'drug' in the second sentence is the drug discussed in the first sentence which is 'narcotic drug, pure or adulterated.' ... This is the statutory meaning as well as the usage and meaning common in drug traffick-

**1338**

ing. Appellants and those with whom they dealt treated these transactions as cocaine sales of the aggregate weight of the substance.

452 N.E.2d at 917. In light of that discussion, we cannot say the Class A felony enhancement of § 4–1 is unconstitutionally vague. Ordinary people can understand that it is the overall rather than pure weight that counts, and there has been no showing that § 4–1 lends itself to arbitrary and discriminatory enforcement.

### B. DUE PROCESS & EQUAL PROTECTION

■ Coleman next argues that the legislature's enactment of the Class A enhancement of § 4–1 violates the guarantees of substantive due process and equal protection of the laws found in the fourteenth amendment to the federal constitution. In regard to due process, he quotes *Richardson v. Belcher* (1971), 404 U.S. 78, 84, 92 S.Ct. 254, 258, 30 L.Ed.2d 231 for the idea that a statute must seek legitimate goals through classifications that are rationally related to achievement of those goals. In Coleman's view, if the purpose of § 4–1 is to punish more severely delivery of larger amounts of illegal drugs, then including adulterants for enhancement defeats that purpose and is irrational. The negation of that is found in the supreme court's reasoning in *Clark, supra:*

> The obvious intent of the legislature [in enacting § 4–1] was to prohibit the sale of controlled substances and to increase the violation to a Class A felony if the amount of drugs sold exceeds three grams. It is common knowledge, which we must assume was known to the legislature, that drugs such as cocaine are not sold on the street in their pure form but are "cut" with inert substances to dilute them to a usable form which will not overdose the user. It is the sale of just such a prepared substance to which the legislature addressed itself.

539 N.E.2d at 12. Although the issue was raised in *Clark* as a sufficiency of the evidence question, we find implicit in the quoted passage a rejection of Coleman's substantive due process argument. *See*

*also Hall, supra* (approving rational basis test and finding a rational basis for predecessor statute of § 4–1).

■ As to equal protection of the laws, Coleman asserts that § 4–1 is unconstitutional because it punishes a defendant who delivered .01 gram of cocaine mixed with 2.99 grams of adulterant more severely than one who delivered 2.99 grams of pure cocaine, citing *United States Dep't of Agric. v. Moreno* (1973), 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782. This argument fails because precisely the same theory was raised in *Tobias, supra,* but in dissent. 479 N.E.2d at 512 (Prentice, J., dissenting). The majority opinion in *Tobias,* as in *Clark,* focused on the enhancement issue as a sufficiency of the evidence question. However, because the .01/2.99 equal protection theory was argued in dissent, we must conclude that the majority rejected such a position. Moreover, our supreme court in *Lawhorn* unanimously repudiated an argument numerically distinct from the foregoing but nevertheless expressly based on equal protection. *See* 452 N.E.2d at 917–18 (argument that § 4–1 enhancement "would unequally penalize persons who sell identical amounts of pure cocaine—the inequality based on whether the cocaine was mixed with enough other substance to make an aggregate weight in excess of three grams.... The primary state interest served by drug dealing statutes is not simply the harm caused by a particular dosage, but the societal harm caused by the dealing itself.")

That § 4–1 is not unconstitutionally vague and does not offend the rights of due process and equal protection is reinforced by *Chapman v. United States* (1991), —— U.S. ——, 111 S.Ct. 1919, 114 L.Ed.2d 524, *reh'g denied,* in which the Supreme Court considered a federal statute imposing an enhanced sentence for distributing more than one gram of a "mixture or substance containing a detectable amount of lysergic acid diethylamide (LSD)." 21 U.S.C. 841(b)(1)(B)(v). The petitioner argued that because the weight of LSD is trivial compared to that of its carrier medium, the weight of the carrier should be

excluded when determining sentence. That is, one dose of pure LSD weighs only .05 milligrams, meaning there are 20,000 doses in a pure gram. Because a dose is so miniscule, it is routinely combined with a more substantial carrier medium. One type of carrier medium, a sugar cube, weighs typically more than two grams. Therefore, one who distributes but one dose in a sugar cube is subject to an enhanced sentence, while one who distributes pure LSD sufficient to make 19,999 doses is not. The Court held the statute requires the weight of the carrier to be included for sentencing purposes, and that such a construction was neither unconstitutionally vague nor a violation of due process.

## C. PROPORTIONAL SENTENCING

Coleman's final constitutional theory restates the foregoing equal protection argument in terms of our state constitution, which in art. 1, § 16 mandates that penalties be proportioned to the nature of the offense.[1] According to Coleman, basing enhancement on total rather than pure weight can yield disproportional sentences, imposing for example the Class A felony presumptive thirty-year sentence for delivery of three grams of "tainted talcum powder," while imposing only the ten-year presumptive sentence for a Class B felony for delivery of 2.99 grams of pure cocaine.

■ The State's brief is silent on this point, so Coleman need only show a *prima facie* case to be granted relief. *Jorgensen v. State* (1990), Ind.App., 559 N.E.2d 616, 618. However, Coleman has not cited any case or other authority on the meaning of Indiana's proportionality guarantee, so the issue has been waived. *See Stroud v. State* (1988), Ind., 517 N.E.2d 780, 783. Moreover, although "hypothetical cases can be imagined," they "are of no import in considering a claim by persons such as"

Coleman, who distributed cocaine of 75%–80% purity, not tainted talcum powder. *Chapman, supra*, 111 S.Ct. at 1928. Coleman's case falls among "the vast majority of cases [that] do exactly what the sentencing scheme was designed to do—punish more heavily those who deal in larger amounts of drugs." *Id.* Similarly, Coleman was sentenced to twenty years' imprisonment, not the presumptive thirty-year sentence envisioned by § 4–1(b), further enervating his proportionality argument.

■ Notwithstanding waiver, and the nonconformity between these facts and the perhaps more compelling hypothetical of a long sentence for dealing a tiny amount of pure drug, we see no merit here. A proportionality challenge to § 4–1 enhancement has already been rejected through the combined holdings of *Hall, supra* and *Marts v. State* (1982), Ind., 432 N.E.2d 18. In *Hall*, the supreme court linked art. 1, § 16 proportionality to the "grossly out of proportion to the severity" of the crime standard used in federal eighth amendment jurisprudence to analyze claims that the length of a sentence amounted to cruel and unusual punishment. 403 N.E.2d at 1388. Then, *Hall* rejected an art. 1, § 16 proportionality challenge to a statute punishing delivery of any amount of cocaine with five to twenty years' imprisonment, and twenty years to life for amounts over ten grams in aggregate. In *Marts*, the supreme court rejected an argument that Class A enhancement for delivery of three grams of a mixture containing cocaine is cruel and unusual punishment. 432 N.E.2d at 22.[2] Given *Marts*, and the linking of proportionality to cruel and unusual punishment in *Hall*, we conclude that § 4–1 enhancement does not violate the proportionality requirement of Ind.Const. art. 1, § 16. Coleman's displeasure with the holdings in *Hall, Clark*

1. "Excessive bail shall not be required. Excessive fines shall not be imposed. Cruel and unusual punishments shall not be inflicted. All penalties shall be proportioned to the nature of the offense." Ind.Const. art. 1, § 16.

2. The defendant in *Marts* received a Class A sentence of thirty years. A subsequent petition for post-conviction relief included a stipulation

from the prosecutor that six years would be a proper sentence. The petition, raising the question "whether [Marts's] sentence constituted cruel and unusual punishment in violation of the State and Federal Constitutions" was denied, being barred by *res judicata*. *Marts v. State* (1985), Ind., 478 N.E.2d 63, 64.

and *Lawhorn* is less appropriately addressed to this court than to the supreme court in an Ind.Appellate Rule 11(B)(2)(d) petition to transfer, or to the legislature.

## II. PRIOR INCONSISTENT STATEMENT

■ Turning now to the evidence issue, the question presented is whether the prosecutor laid a proper foundation for introducing extrinsic evidence of a defense witness's prior inconsistent statement. In general, a witness to be impeached with a prior inconsistent statement must be allowed an opportunity to admit, explain away, or deny the prior statement. If the witness admits to, or explains away the prior inconsistent statement, impeachment is complete, and extrinsic evidence of the statement is inadmissible. R. Miller, *Indiana Evidence*, § 613.102 (1984).

■ However, if the witness denies having made the statement, the cross-examiner may, upon a proper foundation, introduce extrinsic evidence to prove the statement was made. To lay a foundation, the cross-examiner must first call the witness's attention to the attendant circumstances: "the time when, the place where, and the person to whom the contradictory statement is alleged to have been made." *Id.* at 636. And, the prior statement must be identified with sufficient specificity that the witness will recognize it. *Id.* In sum, a proper foundation is that which "is framed in such a manner as would adequately call the alleged utterance to the attention of the witness sufficiently to enable him to recollect the same, if recallable." *Gradison v. State* (1973), 260 Ind. 688, 709, 300 N.E.2d 67, 81.

■ The prior statement here was allegedly spoken by Christine Drapeza, Coleman's girlfriend and roommate, to the police as they served an arrest warrant on Coleman in the apartment he and Drapeza shared. Drapeza's statement implied Coleman had at some earlier time been involved in drug activity other than his one delivery to the informant. The extrinsic evidence of the statement was the testimony of the

arresting officers that they heard it uttered.

Coleman's defense was entrapment. He admitted it was in his apartment where the informant, one Calvin Buck, received the cocaine mixture, and that he had accepted Buck's purchase money. However, he portrayed himself as a reluctant middleman who had never used cocaine. He testified that Buck had importuned him for cocaine to no avail, until Coleman's chance meeting with one Michael Scott, a cocaine dealer, led to Scott bringing the 3.23 grams to Coleman's apartment for delivery to Buck, who lived in the same apartment complex as Coleman. Buck was not home, so Scott departed, leaving the cocaine in Coleman's apartment for later delivery to Buck. Coleman stated he had not so much as touched the 3.23 grams. He merely left it where Scott had laid it, and later summoned Buck. Thus, Drapeza's alleged statement was highly probative on the predisposition aspect of entrapment. *See* I.C. 35–41–3–9(a)(2); *Smith v. State* (1991), Ind., 565 N.E.2d 1059 (prosecution must refute entrapment defense by showing the accused was predisposed to commit the crime, and police activity did not persuasively affect the accused's free will).

Drapeza testified as a defense witness. On cross-examination, the prosecutor called Drapeza's attention to the time of Coleman's arrest. This exchange occurred:

Q Okay. What was he under arrest for?

A They said something about drugs.

Q Okay. Did you make a statement at that time? You were angry weren't you?

A I was shocked.

. . . .

Q You testified at some point they said[,] that you heard them at the apartment say he was under arrest for drugs?

A All right.

Q Yes or no?

A Yes.

Q Okay. Did you make a statement during your excitement to the officers?

A Yes.

Q Okay. Did you tell the officers that he hadn't done that for four months?

A That's not correct.

Q Okay. You're denying making a statement at the time he was arrested that he hadn't done that?

A I didn't say that, no.

Q Okay. Tell me what you said.

A I told them that they were wrong, they got the wrong person.

Q Okay, so if you said, I want to make sure I understand this, if you said, he hadn't done that for four or five or six months—

A No, I didn't say that.

Q —that wouldn't be correct?

A No, I did not say that.

Q Okay. Is there any other time other than for this case that he got arrested at your apartment?

A No.

Record at 560–62.

After the defense rested, the prosecution called rebuttal witnesses, including police officer Joseph Brown, who was part of the team that served the arrest warrant on Coleman. This exchange occurred during Brown's testimony:

Q Okay. When you go in and serve the warrant, what happened?

A We were met at the door by the girlfriend and we told her what we were there for.

Q Okay. What did she say to you?
    [Objection overruled]
    . . . .

A She became quite irate.
    [Objection overruled]

Q Continue, please.

A She asked for an explanation of what the charges were. Those were explained to her, and when they were, she stated that he was—
    [Continuing objection noted for record]

Q Before we were interrupted you indicated she got irate when you told her why you were there.

A She asked for an explanation of what the charge was for. The charge was explained to her. And she stated that

he has not sold drugs for over six months, he's going to church trying to get his life in order, this is all a bunch of bullshit, and then it just went on from there.
    [Objection and motion to strike overruled]

Record at 736–39.

The prosecution also called another member of the warrant team, officer Agnes McConnell, whose testimony resembled that of Brown:

Q What did you observe about her?

A She told us that he does not sell drugs anymore and there were not any drugs in the apartment.
    [Objection overruled]

Q So you're in the apartment, you're with Christine Drapeza and she's telling you that he doesn't sell drugs anymore?

A Yes, sir.

Record at 745–46.

Thus, both officers testified that Drapeza said Coleman was no longer *selling* drugs. However, the prosecutor's foundational questions during his cross-examination of Drapeza was to a statement that Coleman was no longer *doing* drugs. Therefore, argues Coleman, the foundation was insufficiently specific to allow Drapeza to recall the prior statement.

We disagree. The argument depends on an overly circumscribed definition of to "do" drugs, as meaning only to consume them, and excluding to sell them. In such a limited usage, the foundation and the extrinsic evidence are inconsistent, and arguably the witness's attention was not sufficiently narrowed. However, we conclude the foundational questions were sufficiently specific.

Drapeza acknowledged she heard the arresting officers say Coleman was being arrested "for drugs." The prosecutor then asked her whether she had told the police that Coleman "hadn't done that." Later, the police testified that Drapeza had said Coleman had not "sold" drugs or "does not sell drugs." On this record, we cannot say the "do"/"sell" discrepancy between the

foundational question and the extrinsic evidence created a possibility that Drapeza and the prosecutor were thinking of different statements or different circumstances. The prosecutor asked Drapeza whether she mentioned "doing" drugs; Drapeza denied making such a statement, testifying instead, in direct response, that she had said the police were arresting the wrong person. There was nothing unfair or surprising to the witness. We see no error in admitting the Brown and McConnell testimony.

Lastly, Coleman raises a related argument, that the jury was not admonished to consider the Brown and McConnell testimony only for impeachment purposes, and not as substantive evidence of the truth of the prior statement. Once again, as in part I–C, the State's brief is silent on the point, but the issue appears in Coleman's brief as little more than an afterthought, lacking cogent argument. We consider it waived. *See Stroud, supra.* We note that the jury received a final instruction # 16A informing them that evidence of a prior inconsistent statement is used only to evaluate the credibility of a witness who denied making such a statement, not as substantive evidence of the defendant's guilt or innocence.

AFFIRMED.

SHARPNACK and RUCKER, JJ., concur.