**UNITED STATES of America,**

v.

**Miguel Angel RODRIGUEZ,
Miguel Rodriguez, Appellant in
91–5455,**

**Tony Anderson, Appellant in 91–5494,**

**Francisco C. Martinez, a/k/a
Francisco Collazo,**

**Francisco Collazo–Martinez,
Appellant in 91–5751.**

**Nos. 91–5455, 91–5494 and 91–5751.**

United States Court of Appeals,
Third Circuit.

Argued March 31, 1992.

Decided Sept. 18, 1992.

Rehearing Denied Nov. 13, 1992.

---

Michael Chertoff, U.S. Atty., Edna B. Axelrod, Asst. U.S. Atty., Jose P. Sierra (argued), Asst. U.S. Atty., U.S. Dept. of Justice, Newark, N.J., for appellee.

Chester M. Keller (argued), Asst. Federal Public Defender, Newark, N.J., for appellant Miguel Rodriguez.

Rena Rothfeld (argued), Livingston, N.J., for appellant Tony Anderson.

Patrick A. Mullin, Hackensack, N.J., for appellant Francisco Collazo–Martinez.

Before: BECKER, COWEN and ROTH, Circuit Judges.

## OPINION OF THE COURT

ROTH, Circuit Judge.

In these consolidated appeals from judgments in a criminal case, Miguel Rodriguez, Tony Anderson, and Francisco Collazo–Martinez challenge their sentences. Appel-

lants contend primarily that the district court erred in finding that the boric acid and cocaine in the packages which they attempted to sell constituted a drug "mixture" under the note to Section 2D1.1(c) of the Sentencing Guidelines, a decision that required the court to use the entire weight of the contents of the packages when it set the appellants' base offense levels. Because we hold that the contents of the packages were not a "mixture" under the plain meaning of that term, we will vacate the sentences imposed and remand for resentencing.

## I. Facts and Procedural Background

The facts of this case are not in dispute. On September 17, 1990, federal Drug Enforcement Agency ("DEA") agents accompanied by officers from the Middlesex County Prosecutor's Office arrested appellants Rodriguez and Anderson together with Dennis De Los Santos after a DEA informant attempted to buy three one kilogram packages of cocaine from them at the Chester Circle Apartments in New Brunswick, New Jersey. The sting operation followed a number of contacts between DEA undercover agents and those arrested. Two days later, appellant Collazo–Martinez and Roman Rosado were also arrested as parties to a conspiracy to distribute the cocaine seized from Rodriguez, Anderson, and De Los Santos.

The government's laboratory analysis revealed that the contents of the three packages seized in the sting operation were not what the DEA agents expected. The packages contained in total 65.1 grams of cocaine and 2,976 grams of boric acid, rather than the 3,000 grams of cocaine the agents sought to purchase.[1] The laboratory report and testimony of the government's forensic chemist revealed how the packages were constructed. A compressed block of boric acid formed the base and

approximately ninety-seven percent of the weight of the packages. The compressed boric acid blocks were covered on top by a piece of yellow tape. A thin layer of cocaine was then spread on the surface of the tape. In each brick, cocaine was also placed into a triangular hole or window that had been dug into the compressed boric acid just below the yellow tape. Finally, the bricks were wrapped in plastic and brown paper.

In essence, the brick-like packages were constructed in an effort to fool an unsuspecting customer—in this case a federal drug agent—into thinking that they were comprised wholly of cocaine. A buyer could observe the cocaine which covered the top surface and, if he so desired, could sample the cocaine which was placed into the triangular hole or window dug into the boric acid block. The bottom and sides of the packages were covered by the wrapping to keep a prospective purchaser from observing the true nature of their contents.[2]

The government chemist also testified that the boric acid and cocaine in the packages had distinct colors and could be distinguished by the naked eye. The cocaine found on the surface of the tape and in the triangular hole was white while the boric acid was off white. The chemist advised, moreover, that boric acid is not a controlled substance. A. 29.

In post arrest statements they made separately after being advised of their *Miranda* rights, both Rodriguez and Anderson admitted their involvement in a scheme to pass off these three one kilogram packages as three kilograms of cocaine. According to Rodriguez, "the whole idea was to rip off the American customer for $105,000. The cocaine was placed in the windows so that the Americans could see that it was cocaine."[3] A 47. Rodri-

---

1. The DEA's forensic chemist determined that one block contained 29.1 grams of cocaine and 976 grams of boric acid and that the other exhibit, comprising the two remaining blocks, contained 36.0 grams of cocaine and 2,000 grams of boric acid. A. 281–82.

2. After oral argument, we ordered the government to produce the bricks for our inspection.

3. Rodriguez gave his statement to a government special agent in Spanish. The statement was translated by an interpreter and taken down in a summary form.

guez said that two Dominicans, who provided him with the three packages, had offered to pay him and two other persons $500 each to consummate the sale.

In describing his involvement in the scheme, Anderson related that the person orchestrating the transaction had offered part of the $500 he was to receive from the Dominicans if Anderson would help out as a translator.[4] Anderson said he negotiated the cocaine transaction with the English-speaking customers. Anderson stated that he believed that the three packages, which he had first seen on the street two days prior to the sale, were not cocaine. Anderson added that the person who was responsible for the sale had received the three packages from two Dominicans from New York. Finally, Anderson admitted carrying a loaded .38 caliber handgun to the parking lot where the drug sale was to have occurred.

As part of its case at trial, the government read these post arrest statements into the record. Defendant Collazo–Martinez made no statement after his arrest.

On September 24, 1990, a grand jury sitting in the United States District Court for the District of New Jersey returned an indictment against the defendant-appellants. Rodriguez, Anderson, and De Los Santos were charged on four counts: (1) conspiracy to distribute three kilograms of cocaine in violation of 21 U.S.C. § 846; (2) possession with the intent to distribute three kilograms of cocaine in violation of 21 U.S.C. § 841(a)(1); (3) using a telephone to facilitate a conspiracy to distribute three kilograms of cocaine in violation of 21 U.S.C. § 843(b); and (4) using and carrying a firearm during a drug trafficking crime in violation of 18 U.S.C. § 924(c). Collazo–

Martinez and Rosado were charged on the conspiracy count and on the count alleging phone use in furtherance of the conspiracy.

On the eve of trial, the government attempted to enter into plea agreements with Rodriguez, Anderson, and Collazo–Martinez. Rodriguez was willing to plead guilty to a cocaine conspiracy involving three kilograms of cocaine, the first count of the indictment, in exchange for the dismissal of the remaining counts including the gun possession charge. Anderson also reached an agreement with the government. He agreed to plead guilty to a conspiracy count and the gun possession charge in exchange for the dismissal of his remaining charges but only on the condition that the superseding indictment would leave unspecified the amount of cocaine involved in the conspiracy. Anderson wanted the sentencing court to determine for itself the amount of cocaine involved.[5] Although Rodriguez and Anderson stood ready to accept the government's plea offer, having signed the offers and Rule 11 applications, the government withdrew its deal when co-defendant Collazo–Martinez refused to plead. Even though counsel for Rodriguez and Anderson claimed that they were never so informed, the government asserted that the plea agreements were part of a package deal. Without agreements, Rodriguez and Anderson proceeded to trial with Collazo–Martinez.[6]

At trial, a jury convicted Rodriguez on the drug conspiracy and the two related drug charges but acquitted him on the gun charge. The jury convicted Anderson on the conspiracy and possession charges as well as on the gun charge but acquitted him on the charge of using a telephone to facilitate the conspiracy. The jury convict-

---

**4.** On cross-examination, the special agent admitted that he did not take down Rodriguez and Anderson's words exactly as they uttered them.

**5.** Counsel for Anderson was concerned that a plea to the 3,000 gram amount alleged in the indictment would preclude the court from considering the actual amount of drugs involved at sentencing. Anderson wanted his sentence to reflect only the 65 grams of cocaine actually found in the packages.

**6.** On the eve of trial De Los Santos and Rosado did enter guilty pleas to superseding indictments based on the original conspiracy charge. The government allowed the plea agreements to go forward in exchange for their cooperation at trial. The government also offered to make a motion at sentencing for a departure below both the applicable guideline range and mandatory minimum five year penalty if De Los Santos and Rosado provided substantial assistance at trial. *See* U.S.S.G. § 5K1.1.

ed Collazo–Martinez of conspiracy and phone use in furtherance thereof, the two counts on which he was charged. After returning the verdicts, the jury received a special interrogatory asking whether the conspiracy involved less than one hundred or more than three thousand grams of cocaine.[7] After further deliberations, the jury answered that the conspiracy involved more than three kilograms of cocaine.

At sentencing, after extensive argument, the district court reluctantly accepted the recommendation of the probation department that the boric acid and cocaine in the three packages constituted a "mixture" containing a controlled substance under U.S.S.G. § 2D1.1(c) n.*.[8] For that reason the court used the entire weight of the contents of the three packages rather than the weight of the cocaine actually found in them when it set the base offense levels for the defendants' sentences. As the combined weight of the two substances exceeded 2,000 grams, but was less than 3,500 grams, the trial judge set the defendants' base offense levels at 28. U.S.S.G. § 2D1.1(c)(8) (Nov.1990). Following the probation department's recommendation, the court gave Rodriguez a four level increase for his role as an organizer of a criminal activity that involved five or more people. U.S.S.G. § 3B1.1(a). The probation department deemed none of the defendants eligible for a two level reduction for acceptance of personal responsibility under U.S.S.G. § 3E1.1. The court accepted the recommendation of the probation department to deny these reductions but acknowledged the difficulty of its decision, given

that Rodriguez and Anderson had attempted to enter guilty pleas prior to trial.

Rodriguez' guideline imprisonment range was 121 to 151 months based on a total offense level of 32 and no criminal history. He received concurrent 144 month sentences on the drug conspiracy and possession convictions together with a 48 month concurrent sentence on the conviction for using a phone to further the drug conspiracy.

Anderson's guideline imprisonment range was 78 to 97 months based on an unadjusted offense level of 28 and no criminal history. Anderson received concurrent 78 month sentences on the drug conspiracy and possession counts to be served consecutively with a 60 month mandatory sentence for possessing a gun during a drug trafficking crime. 18 U.S.C. § 924(c).

Because Collazo–Martinez had a previous drug conviction, he fell into criminal history category III. Based on his unadjusted offense level of 28 and criminal history, Collazo–Martinez' guideline imprisonment range was 97 to 121 months. However, Collazo–Martinez' previous drug felony mandated a ten year minimum term of imprisonment under 21 U.S.C. §§ 846 and 841(b)(1)(B) for his drug conspiracy conviction. Pursuant to U.S.S.G. § 5G1.1(c)(2), Collazo–Martinez' resulting guideline imprisonment range was 120 to 121 months. He received a 120 month sentence on the drug conspiracy count together with a concurrent 96 month sentence on the count for using a phone to further the conspiracy.

Each of the defendants has appealed from the court's judgment, and we have consolidated their appeals for disposition.

**7.** Counsel for Anderson requested this special interrogatory because Anderson steadfastly refused to acknowledge that the conspiracy involved more than 65.1 grams of cocaine and wanted a jury finding to that effect which would bind the trial court at sentencing. The government objected to using the special interrogatory on the ground that the sentencing court retained exclusive power to determine the drug quantities for purposes of calculating sentences on the conspiracy and possession counts.

We believe the interrogatory was inappropriate in this case, as the determination of whether the boric acid and cocaine contents of the packages fit within the statutory and guideline defi-

nition of "mixture or substance" was a question of law for the court to decide for itself.

**8.** The sentencing court's reluctance to accept the probation department's recommendation at the joint Rodriguez and Anderson hearing apparently stemmed from a dearth of authority from this Court on the "mixture" question. However, the sentencing court subsequently found support for its determination in *Chapman v. United States,* —— U.S. ——, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991), discussed *infra,* which was decided after the sentencing of Rodriguez and Anderson but prior to the sentencing of Collazo–Martinez.

We have jurisdiction over the appeals under 18 U.S.C. § 3742(b) and 28 U.S.C. § 1291. The district court had subject matter jurisdiction in this matter pursuant to 18 U.S.C. § 3231.

## II. Discussion

### A.

■ We discuss first the defendants' primary contention on appeal, their argument that the district court erred in its determination that the contents of the three packages of boric acid and cocaine constituted a "mixture" such that their total weight should be used in setting the base offense level.

■ The question of whether the combination of cocaine and boric acid constituted a "mixture or substance" under section 2D1.1 of the Sentencing Guidelines is a legal question over which we exercise plenary review. *United States v. Murillo*, 933 F.2d 195, 197 (3d Cir.1991).

Section 2D1.1 of the guidelines imposes punishment for drug-related crime based on the type and weight of drugs involved in the criminal activity. As for mixtures of illegal drugs and other materials, the Drug Quantity Table provides:

> Unless otherwise specified, the weight of a controlled substance set forth in the [drug quantity] table refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance.

U.S.S.G. § 2D1.1(c) n.* (Nov. 1, 1989). Although the commission's comments to section 2D1.1 state that the words "mixture or substance as used in this guideline" have "the same meaning as in 21 U.S.C. § 841,"

*see* U.S.S.G. § 2D1.1 (commentary) (application note 1), neither section defines these terms.[9]

Recently, in *Chapman v. United States*, — U.S. —, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991), the Supreme Court focused on the meaning of the phrase "mixture or substance." Examining the case of defendants who were convicted of selling blotter paper containing LSD, in violation of 21 U.S.C. § 841(a), the Court held that the weight of the blotter paper or drug carrier medium should be included along with the weight of the LSD under the "mixture or substance" language of 21 U.S.C. § 841 and the Sentencing Guidelines. The Court found that "blotter paper customarily used to distribute LSD, is a 'mixture or substance containing a detectable amount' of LSD." *Chapman*, — U.S. —, 111 S.Ct. at 1925 (quoting 21 U.S.C. § 841). In reaching this determination, the Court looked to the ordinary meaning of the words as "[n]either the statute nor the Sentencing Guidelines define the terms 'mixture' and 'substance,' nor do they have any established common law meaning." *Id.* The court reasoned that under the plain dictionary meaning of the term "mixture," the weight of the blotter paper must be included, as the LSD could not be "distinguished from the blotter paper, nor easily separated from it." *Id.* — U.S. at —, 111 S.Ct. at 1926.[10]

The factual situation presented by the boric acid and cocaine readily distinguishes the instant matter from *Chapman*. *Chapman* concerned a true mixture. LSD was "diffused among the fibers of the paper." *Chapman*, — U.S. at —, 111 S.Ct. at

---

**9.** 21 U.S.C. § 841(b)(1)(B) provides:
> In the case of a violation of subsection (a) of this section involving—(ii) 500 grams or more of a mixture or substance containing a detectable amount of—(II) cocaine ... such person shall be sentenced to a term of imprisonment which may not be less than five years and not more than 40 years....

The definition section applicable to section 401, 21 U.S.C. § 841, also does not define the terms "mixture or substance."

**10.** The Court did not define the word "substance." Previously, we have held that hybrid

drugs, such as tylenol mixed with codeine, are examples of substances containing a controlled substance under section 841. *See e.g. United States v. Gurgiolo*, 894 F.2d 56, 59 (3d Cir.1990). The term "substance" denotes a species of matter which has a definite chemical composition. Because, as we discuss *infra*, the contents of the packages do not form a species of matter which has a definite composition but appear to be two different materials placed in close proximity, we will limit our inquiry to whether the boric acid and cocaine in the packages constitute a "mixture."

1926. In contrast, the cocaine here was not mixed in among the particles of the boric acid. The cocaine was set on top of the boric acid so that it was visible and accessible to the prospective purchaser. The government's own chemist testified that the cocaine and boric acid could be distinguished on visual inspection because of their different colors. Moreover, the chemist easily separated the cocaine from the boric acid in these packages. While it is true that the government chemist had to scrape some of the particles of cocaine from the surface of the boric acid, these particles were not commingled or blended with the particles of the boric acid. Rather they adhered to the boric acid only in the manner in which the contents of a container may stick to its sides.

When particles are mixed together it takes more effort to separate them than to scrape one layer from another. Though the boric acid and cocaine were placed in close proximity, they remained, like the layers in a sundae, separate and distinct.

*Chapman* is also distinguishable as it concerned a traditional carrier medium for LSD. Dealers routinely transport and sell LSD on blotter paper. Moreover, users of LSD apparently do not always separate LSD from the blotter paper when they consume the drug. "Like heroin or cocaine mixed with cutting agents, the LSD cannot be distinguished or separated from the blotter paper. Like cutting agents used with other drugs that are ingested, the blotter paper, gel, or sugar cube carrying LSD can be and often is ingested with the drug." *Id.* —— U.S. at ——, 111 S.Ct. at 1926. The *Chapman* Court held that the plain meaning of "mixture" should include those combinations of an illegal drug and carrier medium which dealers use routinely to distribute a drug. *Id.* —— U.S. at ——, 111 S.Ct. at 1928.

We have no finding here that the compressed boric acid in the packages was used or intended to be used as a cutting agent. The cocaine found on the boric acid blocks had already been cut or adulterated with some other substance. The government chemist testified to its poor quality; the cocaine was only 28 percent pure. Though we note that cocaine apparently can be cut with boric acid, *see, e.g., United States v. Terzado–Madruga,* 897 F.2d 1099, 1121 (11th Cir.1990) (government chemist testified that boric acid is commonly used as antiseptic or insecticide, yet witnesses testified that defendant cut his cocaine with boric acid and acetone); *United States v. $10,000 in U.S. Currency,* 780 F.2d 213, 219 (2d Cir.1986) (passing reference to boric acid as diluent for cocaine); *Blanco v. State,* 515 So.2d 115, 121 (Ala.Crim.App. 1987) (testimony that state chemist had previously tested 700 to 800 cocaine samples and never found cocaine mixed with boric acid supported a finding that defendant constructively possessed the cocaine and boric acid mixture seized), both the construction of the packages and the ratio of their contents demonstrate that the boric acid which filled the packages was not used or intended for use as a cutting agent for the cocaine. Not only was the cocaine placed on top of the boric acid, but it does not seem possible that the 2976 grams of boric acid, which comprised over 97 percent of the weight of the contents of the packages, could have been used to cut the already dilute cocaine without rendering the resulting mixture unmarketable.

Moreover, unlike the blotter paper in *Chapman,* the boric acid here did not facilitate the distribution of the cocaine. The government does not argue that the street market in cocaine works by dealers selling small amounts of cocaine placed in or on large blocks of boric acid. In sum, the compressed boric acid was not used either as a cutting agent or routine transport medium for the cocaine such that its proximity to the cocaine here would constitute a "mixture" as *Chapman* elucidates that term. While *Chapman* requires the trial court to use the entire weight of the poor quality cocaine found in the packages to determine base offense levels, as that cocaine could have been sold and consumed, it does not support using the weight of the compressed blocks of boric acid.[11]

---

**11.** We note that the real mixture present in this case is the 65.1 grams of cocaine itself. As

The *Chapman* Court found support for its decision in the legislative history behind Congress's decision to set mandatory minimum sentences based on the weight of a "mixture or substance" containing a detectable amount of a controlled substance. The Court noted that Congress employed a market-oriented approach to punish retail traffickers as severely as those higher up the distribution ladder because small peddlers keep the street markets going. The Court concluded it was rational for Congress to set penalties based on the weight of blotter paper because the paper is "a tool of the trade for those who traffic in the drug" that "makes LSD easier to transport, store, conceal, and sell." *Id.* —— U.S. at ——, 111 S.Ct. at 1928.

Our reading of *Chapman* suggests that Congress was concerned with mixtures that will eventually reach the streets—consumable mixtures. *See id.* —— U.S. at ——, 111 S.Ct. at 1926, 1927–28 (citing H.R.Rep. No. 99–845, pt. 1, 11–12, 17 (1986)) ("House Report"). This legislative history will not support the decision to include the weight of the boric acid in determining appellants' base offense levels. The facts here do not present the situation which concerned Congress, where the whole three kilograms would be sold on the street and consumed by drug users. Not only was the boric acid not mixed with the cocaine, but as we note above, the proportion of cocaine to boric acid in the whole mass, if mixed, would render the resulting product unsalable and unusable—and probably even toxic.[12] The boric acid functioned more like a packaging material on which and into which the cocaine was placed and from which the cocaine would have to be removed for use. *Chapman* recognized that packaging material was not to be included in the weight calculation. *Id.* —— U.S. at ——, 111 S.Ct. at 1926. *See, e.g., United States v. Robins,* 967 F.2d 1387 (9th Cir.1992) (cornmeal mixed with cocaine is functional equivalent of packaging material and is not included in the weight calculation under *Chapman*); *United States v. Acosta,* 963 F.2d 551, 554 (2d Cir.1992) (creme liqueur mixed with cocaine is the functional equivalent of packaging material and its weight should not have been included in calculating defendant's sentence under *Chapman*).

Moreover, the intent of the sellers here is uncontested. While the typical conspirators dilute cocaine to increase the amount of drugs available to sell to consumers, the undisputed facts here show that the cocaine was used only to effectuate the scam by masking the identity of the boric acid blocks. The defendants sought to pass off the boric acid as cocaine by constructing the three packages in the manner described. This was not the ordinary drug product moving in the stream of commerce in the manner envisioned by Congress.

Save for the difference in the ratio of drugs to carrier medium and the fact that boric acid may be more readily used in small quantities as a cutting agent, our holding comports with the Ninth Circuit's recent decision in *United States v. Robins,* 967 F.2d 1387 (9th Cir.1992). In *Robins,* the defendant wrapped two bricks of cornmeal weighing 2,779 grams with duct tape and then made a small incision on the top into which he poured 0.1 gram of cocaine. Robins attempted to trick customers into thinking that the cornmeal bricks were cocaine. Reviewing Robins' sentence, the Ninth Circuit found that the trial court had erred when it included the weight of the cornmeal as part of a drug "mixture or substance" under section 2D1.1. While the court conceded that the cocaine was mixed in with the cornmeal, it reasoned nonetheless that unlike the LSD and blotter paper at issue in *Chapman,* the cornmeal and cocaine were easily distinguishable, the cornmeal was not a "tool of the trade" or a carrier medium or cutting agent for cocaine, and the cornmeal "did not facilitate

---

noted above, this cocaine was cut or diluted. Yet its gross weight, despite the large amount of impurities, must be used to determine the offense level under *Chapman*.

12. Texas Regional News, UPI, Oct. 26, 1988, *available in* LEXIS, Nexis Library, UPI File (four people who died within 18 hours of each other apparently fell victim to cocaine believed to have been mixed with boric acid).

the distribution of cocaine." *Robins, supra* 967 F.2d at 1389.

Like *Robins,* several other Courts have distinguished *Chapman* as applied to drug mixtures. In *United States v. Rolande-Gabriel,* 938 F.2d 1231 (11th Cir.1991), the court held that the weight of the liquid into which cocaine had been dissolved should not be counted for the purposes of setting the defendant's offense level as the cocaine mixture in its dissolved form was unusable in contrast to the LSD impregnated paper in *Chapman* which was ready for sale, use, or ingestion. *Id.* at 1237. The court held that, "[t]he entire weight of drug mixtures which are usable in the chain of distribution should be considered in determining a defendant's sentence." *Id. Accord United States v. Acosta,* 963 F.2d 551 (2d Cir. 1992); *see also United States v. Jennings,* 945 F.2d 129 (6th Cir.1991) (district court erred in including the poisonous and other unusable parts of a methamphetamine mixture for sentencing purposes).

The First Circuit alone has taken a contrary view. In *United States v. Mahecha-Onofre,* 936 F.2d 623 (1st Cir.1991), the court interpreted *Chapman* to require that the weight of acrylic suitcase material to which cocaine had been chemically bonded be included for sentencing purposes as "the suitcase/cocaine 'mixture' or 'substance' fits the statutory and Guideline definitions as the Supreme Court has recently interpreted them in *Chapman.*" *Mahecha-Onofre,* 936 F.2d at 626. The court found that the fact that the cocaine had to be separated from the suitcase material before use and that the suitcase material could not be consumed like blotter paper or cutting agents did not distinguish the case from *Chapman.* *Id.* *Accord United States v. Lopez–Gil,* 965 F.2d 1124 (1st Cir.1992) (*panel reh'g denied* (suitcase issue); *panel reh'g granted* (part of original opinion withdrawn, and case remanded to district court for further findings on other grounds).

We find that the usable/unusable differentiation adopted by the Second, Sixth, Ninth, and Eleventh Circuits, rather than the First Circuit approach, best follows the reasoning in *Chapman.* In addition, this conclusion is more consistent with the aim of the Sentencing Guidelines to promote uniformity and proportionality in sentencing. *See* 28 U.S.C. § 991(b)(1)(B); U.S.S.G., Ch. 1, Pt. A, at 1.2 (policy statement). For instance, we can find no difference in culpability between individuals who bring drugs of an identical amount and quality of drugs to market but scheme to sell them in different amounts of unusable substances. If, for example, A tries to pass off as 1500 grams of cocaine the 75 grams of pure cocaine she places in a hole on a 1425 gram block of boric acid, while B attempts to dupe an unsuspecting purchaser into buying 2500 grams of cocaine by placing his 75 grams of pure cocaine in a 2425 gram block of boric acid, they have both brought the same amount of usable drugs to market— 75 grams. It defies logic to say that the two scam artists should be sentenced differently under guidelines that were designed to penalize dealers for the amount of drugs they place into the market.

Under the circumstances of this case, therefore, we will not set the base offense level by combining the weight of the cocaine with the weight of the boric acid. That result would punish the appellants as harshly as if they had sold 3000 grams of pure cocaine, a quantity 46 times larger than the amount of cocaine they actually attempted to sell.

We find that the evidence establishes that the contents of the packages were not a mixture and that, even if the contents had been mixed, the mixture would not be readily usable. We conclude, therefore, that the defendants should have been sentenced based on the 65.1 grams of usable cocaine that had been mixed with a cutting agent.

■ At oral argument, the government argued that any remand for resentencing should affect only the sentences of Rodriguez and Anderson on their convictions for possession with the intent to distribute. The government argued that there was sufficient evidence in the record for the trial court to have found that the object of the conspiracy was three kilograms of cocaine

so that we should not vacate and remand the defendants' sentences on the drug conspiracy count.[13] While we recognize that the case law and the sentencing guidelines allow the sentencing court to look beyond the amount of drugs actually seized and consider the negotiations when making the sentencing determination of the amount of drugs involved, *see, e.g.*, U.S.S.G. §§ 1B1.3 (commentary) (application note 1) and 2D1.4 (commentary) (application note 1), nevertheless, we find here that the government produced no evidence of availability to the defendants of three kilograms of cocaine and that the district court made no finding that a higher guideline range was justified by any ability of defendants to deliver in fact three kilograms of cocaine to the proposed purchasers. *See United States v. Gessa*, 971 F.2d 1257, 1263 (6th Cir.1992) (court is required under § 2D1.4, application note 1, to make findings with respect to defendant's intent and ability to produce the negotiated amount); *United States v. Jacobo*, 934 F.2d 411, 416 (2d Cir.1991) ("§ 2D1.4 contemplates that the court itself is to make findings as to whether the defendant intended to produce the negotiated amount and was reasonably capable of producing that amount").

We will, therefore, vacate the sentences of appellants and remand for resentencing on both the conspiracy and distribution counts.[14]

### B.

■■■■ Appellants Rodriguez and Anderson also assert that the district court erred in failing to grant them two-point reductions for acceptance of responsibility. We have held that it is the defendant who bears the burden of establishing by a preponderance of evidence facts sufficient to warrant this reduction. *See United States*

*v. McDowell*, 888 F.2d 285, 291 (3d Cir. 1989). We apply a clearly erroneous standard to review a finding that a defendant did not accept responsibility. *United States v. Singh*, 923 F.2d 1039 (3d Cir. 1991); *United States v. Cianscewski*, 894 F.2d 74, 83 (3d Cir.1990).

Section 3E1.1(a) of the Sentencing Guidelines provides: "If the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct, reduce the offense level by 2 levels." Section 3E1.1(b) adds: "A defendant may be given consideration under this section without regard to whether his conviction was based on a guilty plea or a finding of guilty by a court or jury or the practical certainty of conviction at trial."

After Rodriguez and Anderson were arrested, both gave full statements to the DEA detailing the nature of the scam as well as the identities of the various participants. As their counsel correctly argued to the sentencing judge, the facts at trial wholly comported with their post-arrest statements.

Moreover, both Rodriguez and Anderson were willing to enter into plea agreements in which they would plead guilty to count one of the indictment, admitting their involvement in the conspiracy. While Rodriguez was prepared to plead to the entire three kilograms, the government was willing to allow Anderson to plead to an unspecified amount because Anderson wanted the sentencing court to determine for itself the quantity of cocaine involved in the conspiracy. Anderson also agreed to plead guilty on the gun possession charge. Rodriguez's plea would have dismissed the gun charge as to him. The forms were signed and both were prepared to enter their pleas when the government revoked the plea

---

**13.** The government supports its argument by reference to cases in which a drug dealer is arrested after delivering part of the total quantity he has promised to sell the purchaser. *See, e.g., United States v. Buggs*, 904 F.2d 1070, 1078 (7th Cir.1990) (and cases cited therein).

**14.** In view of our conclusion that only the 65 grams of cocaine in the three kilogram packages constitute the mixture to be considered in deter-

mining the sentences, defendant Collazo–Martinez will now apparently be sentenced under the provisions of 21 U.S.C. § 841(b)(1)(C) rather than § 841(b)(1)(B). If so, the 10 year mandatory minimum of § 841(b)(1)(B) will no longer apply. Collazo–Martinez's sentence will of course still be subject to enhancement under 21 U.S.C. § 851. *See* footnote 15.

agreements on account of the government's inability to strike a deal with co-defendant Collazo–Martinez.

The government argued at sentencing that neither Rodriguez nor Anderson had to go to trial. If they accepted personal responsibility for their crimes, the government argued, both could have pled guilty to their indictments. Rodriguez and Anderson, however, refused to plead guilty to the full charges against them for specific reasons. Rodriguez did so in order to contest his guilt as to the gun possession count. He was vindicated by his acquittal on that charge. Anderson went to trial in order to leave to the court the issue of the amount of drugs involved in the conspiracy; an issue which we have now decided in his favor.

At sentencing, the discussion focused on the court's difficulty in determining whether it would have granted two level reductions had Rodriguez and Anderson's attempted plea agreements gone forward. The court also struggled to decide whether a reduction should be awarded on account of the attempted pleas. In reaching its decision not to grant the two level reduction, the court looked to the guidelines application note indicating that while a defendant's plea of guilt signals some measure of acceptance of responsibility, a guilty plea does not alone entitle a defendant to an automatic reduction. *See* U.S.S.G. § 3E1.1(c). Yet, the sentencing court ignored the corollary principle which the guidelines embody: that a defendant's decision to go to trial does not prohibit his receipt of a two level reduction for acceptance of personal responsibility. *See* U.S.S.G. § 3E1.1(b) and (commentary) (application note 2). We find that, when the trial court decided whether to award the two level reduction, it erred in failing to consider the reasons for which Anderson and Rodriguez refused to plead to the en-

tire indictment, along with the apparent validity of those reasons. We will, therefore, remand for consideration of this issue by the district court in the resentencing of Anderson and Rodriguez.[15]

### III.

For the foregoing reasons, we will vacate the sentences imposed and will remand for resentencing consistent with this opinion.

---

**15.** We have also considered the remaining issues raised by Collazo–Martinez: that the court erred in denying him a two level reduction for acceptance of responsibility and that the court erred in enhancing his sentence under 21 U.S.C. § 851. We find these grounds for appeal to be without merit and will affirm the sentences imposed insofar as these factors are concerned. Moreover, because we remand for resentencing, we need not consider Rodriguez's contention that the court erred by failing to state its reasons for imposing sentence within the determined range as required by 18 U.S.C. § 3553(c).