

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-6-2002

# USA v. Berroa-Medrano

Precedential or Non-Precedential: Precedential

Docket No. 01-2212

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"USA v. Berroa-Medrano" (2002). *2002 Decisions.* Paper 555.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/555

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

        Filed September 6, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-2212

UNITED STATES OF AMERICA

v.

JUAN D. BERROA-MEDRANO
a/k/a KALIN
a/k/a JOSE RAFAEL RIVERO
        Jose Rivero,
            Appellant

On Appeal from the United States District Court

for the Eastern District of Pennsylvania
(Crim. No. 97-00641-02)
District Judge: The Honorable James McGirr Kelly

Argued February 25, 2002

Before: ROTH, FUENTES and GIBSON,* Circuit Jud ges

(Opinion Filed: September 6, 2002)

        PAUL J. HETZNECKER, ESQ.

        1420 Walnut Street
        Suite 911
        Philadelphia, PA 19102
         Attorney for Appellant

_____

* The Honorable John R. Gibson, United States Circuit Judge for the
Eighth Circuit, sitting by designation.



        PATRICK L. MEEHAN
        United States Attorney

        LAURIE MAGID
        Deputy United States Attorney
         for Policy and Appeals

        ROBERT A. ZAUZMER (argued)
        Assistant United States Attorney
        Senior Appellate Counsel

        BARBARA J. COHAN
        Assistant United States Attorney
        615 Chestnut Street
        Suite 1250

Philadelphia, Pennsylvania 19106
        Attorneys for Appellees

OPINION OF THE COURT

FUENTES, Circuit Judge:

This case requires us to consider what constitutes a "mixture or substance containing a detectable amount" of a controlled substance for purposes of sentencing. Pursuant to a plea agreement, defendant Juan Berroa-Medrano ("Berroa") pled guilty to a single count of conspiracy to distribute heroin, but reserved the right to challenge at sentencing the weight of the heroin in question. At sentencing, although one of the two packages Berroa admitted to distributing contained mostly drug cutting agents and only trace amounts of heroin, the court used the total weight of the two packages as the basis to sentence Berroa to a 100-month prison term. On appeal, Berroa challenges the sentence on the grounds that the court improperly considered the gross weight of the two packages, about 1 kilogram, rather than the net weight of the heroin itself. Because we conclude that the District Court was entitled to consider the entire weight of any mixture or substance that contained a trace amount of heroin, we affirm.

I.

A.

The facts of this case are fairly straightforward. Berroa entered into an agreement with his co-defendant Mustafa Alabed to sell an undetermined amount of heroin to an individual who was actually a confidential informant. On October 28, 1997, the informant, equipped with a wireless transmitter, met with Alabed to arrange for the purchase of one kilogram of heroin.

The informant and Alabed met inside Alabed's carpet store in Philadelphia, and then, to complete the transaction, walked across the street to a building that Alabed was renovating. Inside the building, the two men met Berroa, who was holding a cereal box. Berroa handed the box to the informant, who opened it and found that it contained two separately wrapped packages, one large and one small, each containing an off-white substance that appeared to be heroin. The informant inspected the packages without removing the contents, and returned the box to Berroa, asking the defendants whether the heroin was from the same batch as a sample that had been given to him earlier in the day by Alabed. Alabed assured him that it was. The informant left the building, ostensibly to retrieve the payment for the heroin, but instead informed the drug enforcement agents of what had transpired. When he informed them that he believed Berroa was carrying a gun, the agents decided to wait for backup. Before backup

arrived, however, Berroa fled the scene.

Once the backup officers arrived, Alabed was arrested
and the cereal box containing the two packages of off-white
powder was seized. The larger of the packages, which was
approximately the size and shape of a kilo of heroin, was
field-tested by the agents with negative results for the
presence of heroin. However, the smaller package, which
was on top of the larger one inside the cereal box, field-
tested positive for heroin. The smaller package contained
slightly more than one ounce of off-white powder.
Subsequent laboratory analysis disclosed that the larger
package weighed slightly less than one kilogram (983.9

3

grams) and was comprised almost exclusively of procaine
and lidocaine, common heroin cutting agents. The lab also
determined that the larger package contained traces of
heroin, but the purity of the drug could not be determined
due to its small quantity. The smaller package, weighing 32
grams, contained a similar mix of cutting agents, but with
heroin detected at a purity of 3%.

B.

On December 3, 1997, a federal grand jury indicted
Berroa, in absentia, along with Alabed, and charged him
with conspiracy to distribute heroin in violation of 21
U.S.C. S 846; distribution of heroin in violation of 21 U.S.C.
S 841(a)(1) and 18 U.S.C. S 2; and distribution of heroin
near a school in violation of 21 U.S.C. SS 860(a) and 841(a)(1).1
Berroa was further charged with using and carrying a
firearm in connection with a drug trafficking offense in
violation of 18 U.S.C. S 924(c). Berroa was arrested
approximately one year later in December 1998, in
Camden, New Jersey, on state criminal charges unrelated
to the instant case. Thereafter, he was removed to the
Eastern District of Pennsylvania to face the federal
indictment.

On February 22, 1999, Berroa pled guilty, pursuant to a
written plea agreement, to a single count of a superseding
information charging distribution of heroin in violation of
21 U.S.C. S 841(a)(1).2 The plea agreement provided for
dismissal of the remaining charges. Additionally, Berroa's
plea agreement contained a provision stating that the
parties "have not agreed on the quantity of drugs on which
the defendant's sentence should be calculated under[the
relevant sentencing guidelines], and reserve their right to

_____

1. Alabed later pled guilty to a single count of distribution of heroin, in
violation of 21 U.S.C. S 841(a)(1), and was sentenced to 60 months
imprisonment followed by a five-year term of supervised release.

2. 21 U.S.C. S 841(a)(1) states, in relevant part, that "it shall be unlawful
for any person knowingly or intentionally . . . to manufacture, distribute,
or dispense, or [to] possess with intent to manufacture, distribute, or

dispense, a controlled substance."

4

present their respective positions to the Court and Probation Department." App. Br. at 4.

On May 2, 2001, the District Court sentenced Berroa. The District Court concluded that under the United States Sentencing Guidelines, the entire contents of each package must be included in calculating Berroa's sentence. The court therefore determined that Berroa's offense conduct involved more than one kilogram of heroin, and that, accordingly, Berroa's sentencing guideline range was 168-210 months. However, because of the unusually low purity of the drug, the court granted Berroa a downward departure under U.S.S.G. S 2D1.1(b)(6), and sentenced him to 100 months imprisonment, 5 years supervised release, and a fine of $2,500.3 Berroa timely appealed.

II.

We have jurisdiction to review Berroa's sentence pursuant to 28 U.S.C. S 1291. We review de novo a district court's application of the Sentencing Guidelines. United States v. Henry, 282 F.3d 242, 246 (3d Cir. 2002).

---

3. Application Note 9 to U.S.S.G. S 2D1.1 specifically indicates that an upward departure may be appropriate where the controlled substance is of an unusually high purity. The comment further explains that the purity of a controlled substance, "particularly in the case of heroin, may be relevant in the sentencing process because it is probative of the defendant's role or position in the chain of distribution." Given the Sentencing Commission's omission of any discussion of a downward departure for low drug purity, some courts have decided that a downward departure is permissible while others have disagreed. Compare United States v. Mikaelian, 168 F.3d 380, 390 (9th Cir. 1999) (stating that "the low purity of heroin involved in a crime cannot be categorically excluded as a basis for a downward departure"), with United States v. Upthegrove, 974 F.2d 55, 56-57 (7th Cir. 1992) (holding that "downward departure based on the low quality of the relevant drug is improper" partly because the Application Notes contain "no corresponding provision suggesting a downward departure for low quality drugs").

In this case, the Government acknowledged the District Court's discretion to depart downward based on low purity and does not challenge the exercise of the Court's discretion in this regard on appeal. Gov't Br. at 28-29 & n.10. Accordingly, we need not reach this issue here.

5

III.

A.

The District Court calculated Berroa's sentence using the

Drug Quantity Table, subsection (c) of U.S.S.G.S 2D1.1.4 Application Note (A) of the "Notes to Drug Quantity Table" provides that, "[u]nless otherwise specified, the weight of a controlled substance set forth in the table refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance" U.S. Sentencing Guidelines Manual S 2D1.1(c), cmt. n.A. (emphasis added). The language is derived from the mandatory minimum sentence provision of the statute under which Berroa was convicted. Section 841(b) provides minimum penalties for anyone violating S 841(a), including "100 grams or more of a mixture or substance containing a detectable amount of heroin" 21 U.S.C. S 841(b)(1)(B)(i) (emphasis added). The District Court examined this language and determined that, under the circumstances of Berroa's case, it was required to include the combined weight of both packages in calculating Berroa's sentence. The judge commented that, although it was "unusual" in his experience that a lab was "unable to determine the purity of [the drug in question,]" he could not "ignore [that] . . . [t]here was a detectable amount of a[controlled] substance" in the larger package. App. at A46. Therefore, the court determined that Berroa's base offense level, including a 2-step increase for obstruction of justice based on a false identity charge, was 34, resulting in a guideline range of 168-210 months imprisonment.5

_____

4. U.S.S.G. S 2D1.1 establishes the base offense level for offenses involving the "Unlawful Manufacturing, Importing, Exporting, or Trafficking" of controlled substances, and includes possession with the intent to commit these felonies.

5. Conversely, if the court had decided to include only the contents of the smaller package, or even the contents of the smaller package along with the net weight of the heroin in the larger package, Berroa's base offense level, considering his criminal history category of II, would have been 18. Even with a 2-step increase for obstruction of justice, Berroa's sentence would have been significantly reduced to 30-37 months.

The District Court was not without precedent in deciding to include the entire contents of the larger, highly adulterated package in sentencing Berroa. For example, this Court recently determined that, even when a drug contains a very slight amount of a controlled substance, the entire package must count toward a defendant's sentence. See United States v. Butch, 256 F.3d 171, 177-80 (3d Cir. 2001) (instructing that the District Court must include the gross weight of Endocet pills in calculating a defendant's mandatory minimum sentence under S 841(b), even though the controlled substance (oxycodone) in the pills was merely 0.8% of the total weight of the pills; see also United States v. Touby, 909 F.2d 759, 772-73 (3d Cir. 1990) (holding that the entire weight of 100-gram slab of Euphoria must be considered by sentencing court, even though the controlled substance only comprised 2.7% of the total weight); United States v. Buggs, 904 F.2d 1070, 1077, 1079-80 (7th Cir.

1990) (upholding sentence under S 841(b) for mixture containing 1.2% heroin). Nevertheless, Berroa attempts to distinguish his case by arguing that an immeasurably small "trace" of a controlled substance, together with an overwhelming amount of cutting agent, is neither a "mixture" nor a "substance," either as those terms are commonly understood or as intended by the statute or the Sentencing Guidelines.

The Supreme Court has observed that since the terms "mixture" and "substance" have "not been defined in the statute or the Sentencing Guidelines and [have] no distinctive common-law meaning," they should be "construed . . . to have their ordinary meaning." Neal v. United States, 516 U.S. 284, 289 (1996) (citing Chapman v. United States, 500 U.S. 453, 461-62 (1991)). In Chapman, the Supreme Court analyzed a provision of the Comprehensive Drug Abuse Prevention and Control Act, 21 U.S.C. S 841, et seq., that calls for a mandatory minimum sentence of five years for the distribution of any "mixture or substance" containing LSD that weighed one gram or more. Chapman 500 U.S. at 455 (quoting 21 U.S.C. S 841(b)(1)(B)(v)). The question before the Court was whether, for sentencing purposes, the weight of LSD should also include the blotter paper that is routinely sold with LSD. Id. at 458. The Chapman court reasoned that,

because the LSD was "diffused among the fibers of the paper . . . [and] cannot be distinguished from the blotter paper nor easily separated from it," the entire package constituted a mixture, and therefore, the total weight of the blotter paper along with the absorbed LSD must be considered under the statute. Id. at 462.

Like the LSD and blotter paper in Chapman, the traces of heroin in the package used to sentence Berroa were diffused within the procaine and lidocaine, and the heroin could neither be distinguished nor easily separated from the contents of the package. Thus, the entire contents of the larger of the two packages used to sentence Berroa appears to satisfy the criteria identified by the Chapman court for identifying a "mixture" or a "substance."

Nevertheless, Berroa attempts to distinguish his case from Chapman by relying on this court's decision in United States v. Rodriguez, 975 F.2d 999 (3d Cir. 1992). In Rodriguez, the defendants had taped a thin layer of cocaine (approximately 65 grams) over a much heavier block of boric acid (approximately 3 kilograms) and, attempting to pass the entire package off as 3 kilograms of cocaine, sold this block to undercover government agents as a "gag bag."6 This Court held that, unlike the blotter paper/LSD mixture in Chapman, the sentencing court in Rodriguez should have excluded the weight of the boric acid, and only considered the weight of the much lighter cocaine in calculating the defendant's base offense level under U.S.S.G. S 2D1.1. Rodriguez, 975 F.2d at 1007.

Berroa argues that, like the defendants in Rodriguez, he did not actually intend to sell a kilo of heroin to the informant, but rather meant to "rip him off " by selling him a highly diluted "gag bag." He claims that the immeasurably small amount of heroin in the larger package proves this intent. Therefore, he concludes that as in Rodriguez, the sentencing court should not consider the weight of the non-controlled substances in calculating his sentence.

_____

6. "Gag bag" is street parlance for a highly diluted or completely fake container of drugs. Gov't Br. at 14-15.

However, Berroa's reading of this Court's holding in Rodriguez is too narrow. In Rodriguez, this Court placed as much emphasis on the plain meaning of the term "mixture," in the context of that case, as it did on the intent of the seller. The Rodriguez court observed that, unlike the circumstances in Chapman, in their case: 1) the boric acid and the cocaine remained distinct although in close proximity; 2) the boric acid was not being used as a cutting agent; 3) the boric acid, being highly toxic, was not intended to be consumed; and, 4) the boric acid did not facilitate the distribution of cocaine. Id. at 1004-05. Relying on these characteristics, we concluded that the combination of cocaine and boric acid did not constitute a "mixture or substance" as contemplated by the Sentencing Commission in promulgating S 2D1.1, and that the clear intent of the seller was to use the cocaine "only to effectuate the scam by masking the identity of the boric acid blocks." Id. at 1006.

Berroa's case is clearly distinguishable. First, the trace of heroin in the larger package was not "distinct although in close proximity," but instead was inextricably combined with the procaine and lidocaine. Second, while Berroa may argue that the procaine and the lidocaine in the larger package were not truly used as cutting agents but simply used to trick the buyer into buying a "gag bag," procaine and lidocaine are among the most common cutting agents for street heroin. See Hurtado v. United States , 2001 WL 135742 at *1 (E.D.N.Y. 2001). Indeed, we note that this Court and other courts of appeals have upheld sentences for distribution of a controlled substance where procaine and/or lidocaine were part of the "cut." See, e.g., United States v. Agee, 597 F.2d 350, 352 (3d Cir. 1979) (upholding conviction for sale of heroin that had been diluted with "quinine, procaine and reducing sugar"); United States v. Nelson, 499 F.2d 965, 966 (8th Cir. 1974) (affirming conviction for distribution of heroin "laced with procaine and lactose, the latter two being cutting powders"). Furthermore, neither one of these common cutting agents is toxic, and each is regularly "consumed" by the purchasers of heroin in the normal course of using the drug. See United States v. Gray, 982 F.2d 1020, 1021 (6th

Cir. 1993) (noting that, at trial, the defendant had admitted

9

to using lidocaine in order "to adulterate cocaine for human consumption"). Finally, the presence of the procaine and lidocaine was intended to "facilitate the sale of[a controlled substance]," since pure heroin would likely be toxic to most any user. See Harrison's Principles of Internal Medicine 2567 (Eugene Brumwald et. al. eds., 15th ed. 2001). Clearly, the larger package for which Berroa was sentenced was a "mixture" according to the Rodriguez standards.

Alternatively, Berroa argues that, even if the larger package constituted a "mixture or substance," it was not a "consumable," "marketable," or "ingestible" mixture of the type that numerous courts have determined that Congress and the Guidelines intended to punish. See Rodriguez, 975 F.2d at 1006 ("Congress was concerned with mixtures that will eventually reach the streets--consumable mixtures."); United States v. Acosta, 963 F.2d 551, 553 (2d Cir. 1992) (determining that the Sentencing Guidelines do not require that "the weight of an unusable portion of a mixture, which makes the drugs uningestible and unmarketable, be included in the overall weight calculation"); United States v. Rolande-Gabriel, 938 F.2d 1231, 1237-38 (11th Cir. 1991) (holding that "liquid waste" packed and transported with cocaine was not to be considered part of the "mixture" used to calculate a defendant's sentence, as the liquid was "unusable"). Berroa attempts to draw an analogy between these cases and his own by emphasizing, once again, the immeasurably small portion of controlled substance that was included in the larger bag in his case. He argues that this is not a "marketable" mixture since it is highly unlikely that such a disproportionately low ratio of drugs to"cut" was ever intended to be consumed or ingested, and that therefore, the entire weight of the larger bag should have been excluded in calculating his sentence underS 841(a)(1).

We disagree. In analyzing the cases upon which he relies, Berroa ignores the single factor that was common to the determination of each: that in order for the substance in question to be marketable, ingestible, and/or consumable, either the distributor or the dealer first had to separate the controlled substance from the additional material. See Rodriguez, 975 F.2d at 1006 (determining that block of boric acid and cocaine was not a "marketable mixture"

10

because, inter alia, the "boric acid functioned more like packaging material . . . from which the cocaine would have to be removed [in order to] use"); Acosta, 963 F.2d at 555 ("[T]he 'mixture' here was useless because. . . [i]t could not be ingested or mixed with cutting agents unless and until the cocaine was distilled from the creme liqueur); United States v. Jennings 945 F.2d 129, 137-37 (6th Cir. 1991) (finding that the district court erred in including poisonous

and other unusable parts of a methamphetamine mixture that would otherwise have to be distilled in order to be consumable); Rolande-Gabriel, 938 F.2d at 1237 (distinguishing Chapman because the cocaine mixture at issue was easily separated from its liquid waste carrier medium and had to be separated for the drug to be consumed). The Second Circuit has explained that, in each of these cases, the non-drug portion of the mixture was "the functional equivalent of packaging material . . . which quite clearly is not to be included in the weight calculation." Acosta, 963 F.2d at 554 (citing Chapman, 500 U.S. at 462-63); see also U.S. Sentencing Guidelines Manual S 2D1.1, cmt. n.1 (adopting the reasoning of these cases by instructing that "[m]ixture or substance does not include materials that must be separated from the controlled substance before the controlled substance can be used").

Conversely, common cutting agents such as procaine and lidocaine are added to heroin specifically to facilitate its use by addicts--thereby improving its ingestibility--and to increase its profitability for dealers and distributors-- thereby enhancing its marketability. Because it was aware of this, Congress "clearly intended [that a] dilutant, cutting agent, or carrier medium be included in the weight of [drugs like heroin and cocaine] for sentencing purposes" even though "[i]n some cases, the concentration of the drug is very low." Chapman, 500 U.S. at 459-60. In Chapman, the Supreme Court noted that "Congress adopted a 'market-oriented' approach to punishing drug trafficking, under which the total quantity of what is distributed, rather than the amount of pure drug involved, is used to determine the length of the sentence." Id. at 461. The Court observed that "Congress did not want to punish retail traffickers less severely, even though they deal in smaller

11

quantities of the pure drug, because such traffickers keep the street markets going." Id. The Court further explained that Congress "intended the penalty for drug trafficking to be graduated according to the weight of the drugs in whatever form they were found--cut or uncut, pure or impure, ready for wholesale or ready for distribution at the retail level." Id. Thus it is clear that a small amount of controlled substance combined with common cutting agents is a "marketable mixture" and the weight of the entire mixture must be included for sentencing purposes. We find that Congress' "market-oriented approach" to punishing drug trafficking clearly implicates Berroa's larger package that included a large quantity of procaine and lidocaine and only a trace of heroin.

Berroa makes a related argument that a 'trace' of heroin is not a 'detectable amount' under the Guideline. Only one Circuit appears to have held that an infinitesimally small portion of controlled substance combined in a mixture with common cutting agents should not be considered under the Sentencing Guidelines. See United States v. Jackson, 115

F.3d 843, 848-49 (11th Cir. 1997) (holding that a package which contained 99 percent sugar and 1 percent cocaine was not a "marketable" mixture and that, therefore, only the net weight of the cocaine was relevant to determining a defendant's sentence under the Sentencing Guidelines). To the extent that Berroa relies on Jackson, we disagree. The plain language of both the statute and the guidelines clearly indicates that the presence of "any detectable amount" of a controlled substance requires a sentencing court to consider the entire weight of a mixture. Webster's Dictionary defines detectable as "capable of being detected" and defines "detect" as "to discover or determine the existence, presence or fact of." Webster's Third New International Dictionary 616 (1993). While the initial field test in this case yielded negative results, subsequent laboratory tests indicated traces of heroin in the larger package. Since the lab test disclosed the existence or presence of at least some heroin, there was a "detectable" amount in the larger package.

Finally, we note Berroa's argument that a downward departure is warranted because the unusually low purity of

12

the heroin involved here places the case outside the heartland of cases covered under the guidelines. However, the District Court in fact granted Berroa a significant departure, finding that to do otherwise would "shock the conscience." App. at A 46. As we previously mentioned, in sentencing Berroa, the court first arrived at a Guideline sentencing range of 168-210 months, but then granted Berroa a substantial departure for "low drug purity" under U.S.S.G. S 2D1.1(b)(6). This departure resulted in a sentencing reduction of over 5 years. Berroa's 100-month sentence, based on a mixture containing a very low amount of controlled substance, might appear inequitable. Yet the Court accounted for this concern. The Court's sizeable downward departure for low drug purity mitigates any perceived unfairness here.7

Accordingly, we hold that the traces of heroin disclosed during lab testing in this case, although in amounts too small to determine its purity within a mixture, constitute a detectable amount, and that the District Court did not err when it included the entire weight of the larger package in calculating Berroa's sentence under U.S.S.G. S 2D1.1.

IV.

For the foregoing reasons, the judgment of the District Court is affirmed.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

7. As we previously noted, supra at n.3, the Government acknowledged the District Court's discretion to depart downward based on low drug purity and does not challenge the court's discretionary authority in this regard on appeal.

13