GREGORY, Circuit Judge,
dissenting:
Raymond Surratt will die in prison because of a sentence that the government and the district court agree is undeserved and unjust. The district court sentenced Surratt to life in prison only because it thought it was required to do so pursuant to a statutory mandatory minimum. As it turns out, the correct statutory range for Surratt’s crime was a minimum of twenty years, and a maximum of life.
The majority thinks its hands are tied because Surratt received “only” a life sen *270 tence, and not more than the statutory-maximum. But the only option beyond a life sentence is death. By foreclosing any avenue for post-conviction relief, the majority essentially punishes Surratt for not having received the death penalty. It leaves him to spend the rest of his life in prison; a death sentence of a different kind. In doing so, the majority renders the savings clause a complete nullity in violation of the Suspension Clause.
It is not just a sentence above the statutory maximum that presents a fundamental defect. Life is not always so neat. When a punishment involves a complete deprivation of liberty, then even a sentence exactly at, but not exceeding, the statutory maximum can constitute an extraordinary miscarriage of justice of constitutional magnitude. In such cases, we must allow a prisoner to invoke the savings clause if the Great Writ, which has always been “a bulwark against convictions that violate ‘fundamental fairness,’ ” Engle v. Isaac, 456 U.S. 107, 126, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982), is to mean anything at all. I dissent.
I.
Surratt was 31 years old when he pleaded guilty to conspiracy to distribute cocaine. The Guidelines recommended a maximum penalty of 19.6 years, yet the court imposed a life sentence. It did so while stating that it believed a life sentence-to be undeserved and unjust. J.A. 276. As the district court also remarked, it thought it had no other option pursuant to the statutory, mandatory-minimum lifetime term prescribed by the Controlled Substances Act (CSA) for anyone with two or more predicate felony drug offenses. See J.A. 276; 21 U.S.C. § 841(b)(1)(A).
A few years after Surratt’s first § 2255 motion, in a case remanded to us from the Supreme Court, we corrected our mistaken understanding of just what constitutes a qualifying felony for federal sentencing purposes in United States v. Simmons, 649 F.3d 237 (4th Cir.2011) (en banc). Both parties agree that under our retroactively-applicable Simmons decision, see Miller v. United States, 735 F.3d 141, 147 (4th Cir.2013), Surratt possesses only one CSA predicate felony. The statutory mandatory minimum for someone with one qualifying offense is not is actually the statutory maximum. Id. § 841(b)(1)(A).
Given the difference between twenty years and life, Surratt asks to be resen-tenced. Remarkably, the government agrees with Surratt. Both parties agree that Surratt is legally ineligible to spend the rest of his life in prison. Given this mistake that the parties agree is of constitutional magnitude, the parties further agree that Surratt is entitled to relief from the very sentence that the district court unambiguously stated it would not have imposed absent the erroneous statutory mandatory minimum. They agree the mechanism to do so is by § 2241 motion via the savings clause of § 2255(e).
II.
“The Framers viewed freedom from unlawful restraint as a fundamental precept of liberty, and they understood the writ of habeas corpus as a vital instrument to secure that freedom.” Boumediene v. Bush, 553 U.S. 723, 739, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008). Accordingly, the prohibition on suspension of the writ is contained in the very blueprint of our nation, the Constitution itself. U.S. Const, art. I, § 9, cl.2.
The privilege of the writ of habeas corpus has remained central to our justice system even as the statutory scheme codifying the writ has undergone several transformations over the years. Bourne- *271 diene, 553 U.S. at 740, 128 S.Ct. 2229 (explaining that our Framers recognized a necessity to “secure the writ and ensure its place in our legal system”). Even when Congress added § 2255 to the post-conviction relief statutes in 1948, it did so in an effort to improve administration of habeas corpus hearings. United States v. Hayman, 342 U.S. 205, 219, 72 S.Ct. 263, 96 L.Ed. 232 (1952). The impetus for § 2255 was that federal courts located near prisons had become overwhelmed by petitions from prisoners who, until that point, were required by § 2241 to apply for writs in the district of their confinement. See Hayman, 342 U.S. at 213-15, 72 S.Ct. 263. In this way, § 2255 “replaced traditional habeas corpus for federal prisoners ... with a process that allowed the prisoner to file a motion with the sentencing court.” Boumediene, 553 U.S. at 774, 128 S.Ct. 2229. It was also these 1948 amendments that gave birth to the so-called “savings clause” found in § 2255(e). See Wofford v. Scott, 177 F.3d 1236, 1239, 1241 (11th Cir.1999). The savings clause preserves resort to § 2241 when § 2255 is “inadequate or ineffective to test the legality of [a prisoner’s] detention.” 28 U.S.C. § 2255(e).
The Supreme Court has been explicit that § 2255 was never meant to supplant § 2241, but was simply crafted to address the practical concerns of habeas administration. “Nowhere in the history of Section 2255,” determined the Court, “do we find any purpose to impinge upon prisoners’ rights of collateral attack upon their convictions.” See Hayman, 342 U.S. at 219, 72 S.Ct. 263. This remains true even following Congress’s 1996 amendments to the statute, which created limitations on second or successive petitions in § 2255(h). The savings clause, which Congress chose to retain even while creating these so-called “gatekeeping provisions,” continues to play a crucial role within this scheme. As the Supreme Court recognizes, the savings clause ensures that subsequently-enacted limitations in § 2255 do not run afoul of the Suspension Clause. See Boume-diene, 553 U.S. at 776, 128 S.Ct. 2229.
History therefore confirms that Congress meant for the writ of habeas corpus to remain unabridged even in the face of some limits on collateral review found in § 2255, and that the savings clause plays a distinct and crucial role within the statute. And of course we cannot forget that, ultimately, the writ of habeas corpus is an equitable remedy. See Gomez v. U.S. District Court, 503 U.S. 653, 653-54, 112 S.Ct. 1652, 118 L.Ed.2d 293 (1992); Duckworth v. Eagan, 492 U.S. 195, 213, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989) (“[T]he Court has long recognized that habeas corpus has been traditionally regarded as governed by equitable principles[.]” (internal quotation marks omitted)). These are the principles, including the “principles of fundamental fairness underlying] the writ,” that should guide our resolution of this case. Sawyer v. Whitley, 505 U.S. 333, 351, 112 S.Ct. 2514, 120 L.Ed.2d.269 (1992) (Blackmun, J., concurring).
III.
The majority’s interpretation of the savings clause amounts to a suspension of the writ. The majority denies Surratt any chance to challenge an erroneous life sentence — a fundamental defect of constitutional proportions — for ' two reasons. First, because he is challenging his sentence rather than the underlying conviction, and second, because his sentence is at, but does not exceed, the statutory maximum. The result is that without any textual basis, the majority is punishing Surratt for not having received the death penalty. What a perverse result, to have suffered a fundamental sentencing defect, *272 and then to be punished for not having received the death penalty.
The savings clause extends to more than just attacks on the underlying conviction. See Maj. Op. at 248 (relying on the fact that “Surratt is not innocent of anything”). In fact, there is no textual indication that § 2255(e) precludes a challenge to an erroneous life sentence. When evaluating the plain language of the statute, “Congress’s use of the term ‘detention’ is highly significant to the scope of the savings clause.” Bryant v. Warden, FCC Coleman-Medium, 738 F.3d 1253, 1281 (11th Cir.2013). Congress declined to use the terms, “offense” or “conviction,” both of which it wrote into subsequent provisions of § 2255. See 28 U.S.C. § 2255(f)(1); id. § 2255(h)(1). Instead, its choice of words suggests it meant to broadly preserve the types of challenges available under § 2255(e), consistent with § 2241. If, as the majority says, “we ’are obligated to give effect to Congress’s decision to use different language in proximate subsection of the same statute,” then this obligation actually favors Surratt. See Maj. Op. at 257 (quoting United States v. Brandon, 247 F.3d 186, 190 (4th Cir.2001)).
This reading is consistent with our own case law. We have already determined that nothing in § 2255 was “intended to limit the rights of federal prisoners to collaterally attack their convictions and sentences.” In re Jones, 226 F.3d 328, 332 (4th Cir.2000) (emphasis added). Other circuits agree that “[t]he use of the term ‘detention’ in the savings clause suggests that Congress intended for at least some species of sentencing claims (other than actual-innocence claims) to justify savings-clause relief.” Bryant, 738 F.3d at 1282; see also Brown v. Caraway, 719 F.3d 583, 588 (7th Cir.2013) (explaining that “the text of the [savings] clause ... does not limit its scope to testing the legality of the underlying criminal conviction”).
The majority nevertheless does, not think Surratt raises a sentencing challenge that should be cognizable under the savings clause. See Maj. Op. at 256 (“[Sur-ratt] never suggests that he received a sentence above the applicable statutory maximum.”). This is a breathtaking position considering the extraordinary deprivation of liberty at stake. Surratt raises no “ordinary” sentencing error. He seeks to advance a claim that he does not possess the requisite number of qualifying felony offenses on which his current life sentence is predicated. A life sentence, for which there is no longer any possibility of parole, is the “penultimate” sentence unlike any other except for death. Solem v. Helm, 463 U.S. 277, 303, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), overruled on other grounds by Harmelin v. Michigan, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991). And although second only to death, the two “share some characteristics ... that are shared by no other sentences.” Graham v. Florida, 560 U.S. 48, 69, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010). A life sentence “deprives the convict of the most basic liberties without giving hope of restoration, except perhaps by executive clemency — the remote possibility of which does not mitigate the harshness of the sentence.” Id. at 69-70, 130 S.Ct. 2011. It also “means denial of hope; it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of [the convict], he will remain in prison for the rest of his days.” Id. at 70, 130 S.Ct. 2011 (alteration in original). That Surratt is being erroneously deprived of his liberty for the rest of his life is therefore a fundamental sentencing defect.
*273 There are also fundamental due process concerns raised where, like here, a district court imposes a life sentence at statutory gunpoint. An erroneous mandatory-minimum life sentence is by itself a fundamental defect. See Almendarez-Torres v. United States, 523 U.S. 224, 245, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998) (recognizing that mandatory mínimums can lead to “a minimum sentence of imprisonment more than twice as severe as the maximum the trial judge would otherwise have imposed.”). When operating under a wrongful statutory mandatory minimum, a district court is completely foreclosed from imposing a more lenient sentence. See United States v. Newbold, 791 F.3d 455, 460 n. 6, No. 10-6929, 2015 WL 3960906, at *7 n. 6 (4th Cir. June 30, 2015) (finding- an “erroneously-imposed sentencing floor ... problematic on its own” because “it create[s] the mistaken impression that the district court ha[s] no discretion to vary downward from the low end of [the Guidelines] range”). ' A defendant, however, always has a “substantial and legitimate expectation” under the Fourteenth Amendment to “be deprived of his liberty only to the extent determined by the [trier of fact] in- the exercise of its statutory discretion.” Hicks v. Oklahoma, 447 U.S. 343, 346, 100 S.Ct. 2227, 65 L.Ed.2d 175 (1980). In this case, we know with 100% certainty that the district court considered a life sentence both the floor and the ceiling of what it could impose. “I was required to impose a life sentence,” stated the court, “[a]nd I’ll not forget the frustration I felt in doing that because I did think it was an unjust sentence[.]” J.A. 276.
Continuing to punish Surratt with life imprisonment given that the district court was completely deprived of any statutory discretion whatsoever at sentencing also raises a separate, separation of powers concern. Pursuant to the very design of our government, “defining crimes and fixing penalties are legislative, not judicial, functions.” United States v. Evans, 333 U.S. 483, 486, 68 S.Ct. 634, 92 L.Ed. 823 (1948). “Congress has the power to define criminal punishments without giving the courts any sentencing discretion,” or to provide for individualized sentencing. Chapman v. United States, 500 U.S. 453, 467, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991). For someone like Surratt, with only one qualifying felony drug offense, Congress intended to permit a district court to assign a sentence somewhere in the range of twenty years to life. It did not mandate only a life sentence.
Rather than avoiding a statutory construction that “raises a multitude of constitutional problems,” Clark v. Martinez, 543 U.S. 371, 380-81, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005), the majority reads § 2255 to foreclose any avenue for relief from a fundamental sentencing defect. This is precisely “the failure to allow for collateral review” that “raise[s] serious constitutional questions.” Triestman v. United States, 124 F.3d 361, 377 (2d Cir.1997).
IV.
- The majority arrives at this constitutionally-suspect outcome by departing from the traditional savings clause analysis. It ignores that our precedent has already established a framework for determining whether § 2255 is “inadequate or ineffective.” 28 U.S.C. § 2255(e). As we have demonstrated in Jones, a savings clause inquiry involves a procedural and substantive component. 226 F.3d at 333-34. Yet the majority seeks to paint our Jones decision as something sui generis. Jones is not an alternative “portal” or “route” to savings clause relief. See Maj. Op. at 250. It is the test adopted by our Circuit. *274 When applying that test, it is clear that Surratt satisfies the necessary requirements, both procedural and substantive.
Proeedurally, § 2255 is “inadequate or ineffective” when the retroactively-applicable change in the law that the prisoner seeks to take advantage of occurs subsequent to his first § 2255 motion. This was exactly the case in Jones. Although involving a different fundamental defect— being actually innocent of “using” a firearm within the meaning of 18 U.S.C. § 924(c)(1) — we should follow here the same procedural inquiry. See Jones, 226 F.3d at 329. “[Subsequent to the prisoner’s direct appeal and first § 2255 motion,” did “the substantive law changef]” such that the prisoner’s claim is no longer foreclosed by the “settled law of this circuit or the Supreme Court?” Id. at 333-34.
Surratt brings his savings clause challenge in precisely this posture. The majority protests, however, that Surratt should have brought a § 2255 motion raising his Simmons claim even before Simmons existed. To say that the savings clause preserves an “opportunity” to be heard but that Surratt somehow squandered his even before we decided Simmons is to interpret “opportunity” in a literal manner devoid of any meaning. See Boumediene, 553 U.S. at 779, 128 S.Ct. 2229 (“[T]he privilege of habeas corpus entitles the prisoner to a meaningful opportunity to demonstrate that he is being held pursuant to the erroneous application or interpretation of relevant law.” (emphasis added) (internal quotation marks omitted)). We did not fault Jones for not previously raising his Bailey claim even before that case was decided. Instead, the savings clause was crucially important because “the prisoner’s first § 2255 motion was filed prior to the decision in Bailey, at a time when it would have been futile to challenge the then-prevailing interpretation of the ‘use’ prong of § 924(c)(1).” Jones, 226 F.3d at 333. The Seventh and Eleventh Circuits further agree that § 2255 is proeedurally inadequate when the intervening change in the law takes place after the petitioner’s previously foreclosed, first § 2255 motion. See Brown, 719 F.3d at 586 (“[T]he prisoner must show that he relies on a retroactive decision that he could not have invoked in his first § 2255 motion.”); In re Davenport, 147 F.3d 605, 610 (7th Cir.1998) (“[The prisoner] could not use a first motion under the section to obtain relief on a basis not yet established by law.”); Bryant, 738 F.3d at 1257.
• In addition to this procedural component, § 2255 is substantively inadequate or ineffective when the asserted error represents a fundamental defect, but “the prisoner cannot satisfy the gatekeeping provisions of § 2255 because [he relies on a] new rule [that] is not one of constitutional law.” Jones, 226 F.3d at 334. This requirement is necessary in consideration of § 2255(h), which limits second and successive petitions, in pertinent part, to those relying on a new rule of constitutional law. 28 U.S.C. § 2255(h)(2). The difficulty in Jones was that the intervening change in the law involved a rule of statutory interpretation. Despite the important role played by § 2255(h), we nevertheless determined that the savings clause must in this situation afford an opportunity to raise a previously futile, retroactively-applicable statutory claim, because “otherwise, the savings clause itself would be meaningless.” Jones, 226 F.3d at 333. Other circuits have agreed with this substantive component of the savings clause inquiry in the context of erroneous sentencing enhancements resulting from interpretation of the Armed Career Criminal Act. See Light v. Caraway, 761 F.3d 809, 813 (7th *275 Cir.2014) (Begay[1] claim challenging ACCA enhancement), cert. denied, — U.S. -, 135 S.Ct. 970, 190 L.Ed.2d 834 (2015); Bryant, 738 F.3d at 1257 (same).
Surratt therefore satisfies our savings clause test because his claim raises a fundamental defect predicated on an intervening change in the law of statutory interpretation. The majority, however, disagrees with this conclusion in part because it believes I am “reading] the actual innocence requirement out of Jones.” Maj. Op. 248. To the contrary, I am applying the framework set forth in that case, which considered whether an actual innocence claim is redressable under the savings clause, to out case, which asks whether an erroneously-imposed, statutory, mandatory-minimum life sentence can be redressable under the same provision. Jones admittedly involved a different fundamental defect — a claim under Bailey. But this does not mean that its reasoning cannot extend to Surratt’s claim, which is equally a fundamental defect considering the extraordinary deprivation of liberty at stake. Interpreting Jones in this way would not lead to “permitting] any federal prisoner to bring any non-constitutional claim via § 2241 in any instance where the law” changes. Maj. Op. at 248. Far from opening the floodgates, as the majority suggests, such an approach may provide relief to those who continue to serve life sentences despite not possessing the requisite number of predicate felony offenses under Simmons, which is all of eight prisoners in the Western District of North Carolina.[2] See Def. Br. at 31.
The majority lastly finds it insufficient that Surratt’s fundamental sentencing defect finds its roots in Simmons, an en banc circuit court decision decided upon remand from the Supreme Court, rather than in a Supreme Court decision itself. Of course the savings clause itself does not make this distinction. Nor have we ever insisted, in a world where the Supreme Court grants certiorari in about 75-80 cases per year, that the new rule of statutory interpretation be one decreed by the Supreme Court. See Jones, 226 F.3d at 334 (requiring that “subsequent to the prisoner’s direct appeal and first § 2255 motion, the substantive law changed” (emphasis added)). Nonetheless, the majority writes that “Surratt, premises his claim on a circuit-level decision, even though § 2255(h) specifically states that only a retroactive Supreme Court decision should open the door to successive relief.” Maj. Op. at 259. In actuality, § 2255(h) states that application for successive relief must be based on “a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court.” 28 U.S.C. § 2255(h)(2) (emphasis added). At least one circuit court, however, has found it appropriate to grant relief based on its own finding that Begay, a new rule of statutory interpretation, is retroactive. See Light, 761 F.3d at 814; Welch v. United States, 604 F.3d 408, 415 (7th Cir.2010).
My point is that the majority’s greatest sin is really in picking and choosing whatever rules it wishes to apply to § 2255(e) *276 from other parts of our habeas jurisprudence. It insists that the first part of § 2255(h)(2) applies to the savings clause, but not the second part. It then says the “same principle” of procedural default applies not just to § 2255(f)(2), but also here. See Maj. Op. at 253. This despite its insistence that there is no basis to “tie[ ] th[e] ‘miscarriage’ standard” from initial § 2255 motions to the supposedly “entirely separate question of relief via the savings clause.” Maj. Op. at 251. The majority is really mixing and matching limitations on post-conviction relief.
In disregarding our precedent to affirm a life sentence for Surratt, the majority simultaneously affirms a death sentence for the savings clause. But make no mistake. There already exists an analytical path obligating us to grant Surratt the resentencing that he seeks, and that justice requires.
V.
I do not doubt that the majority is sympathetic to Surratt. In the end, I suppose we just have fundamentally different views on the role of habeas corpus, as well as the role of the judiciary in granting the writ. I see it as our solemn responsibility to guard against a morbid encroachment upon that which is so precious our Framers ensured its continued vitality in our Constitution. Instead we guard the Great Writ itself, and so closely that Surratt must spend the rest of his life in prison— against the will of the government and the district court. Our abdication of this responsibility begs the question: quis custo-diet ipsos custodies? Who will guard the guards themselves?
It is within our power to do more than simply leave Surratt to the mercy of the executive branch. To hope for the right outcome in another’s hands perhaps is noble. But only when we actually do the right thing can we be just. I lament that today we are not the latter. Neither the plain language of our habeas statutes, our precedent, nor the Constitution demands that Surratt die in prison. I must dissent.

. In Begay v. United States, 553 U.S. 137, 128 S.Ct. 1581, 170 L.Ed.2d 490 (2008), the Supreme Court determined that driving under the influence of alcohol did not constitute a "violent felony” as defined by the residual clause of the ACCA. Id. at 139, 128 S.Ct. 1581. The Court has subsequently found the statute's residual clause to be unconstitutionally vague. Johnson v. United States, 576 U.S. -, 135 S.Ct. 2551, 2556-57, 192 L.Ed.2d 569 (2015).

. I must also note that, when it comes to the "tangible benefits” of our decision today, Maj. Op. at 263, it is estimated that Surratt's lifetime of incarceration will cost taxpayers approximately $1.2 million. See Def. Br. at 32.